246 N.J. Super. 62 (1990)
586 A.2d 870
ASBURY PARK PRESS, INC., PLAINTIFF,
v.
BOROUGH OF SEASIDE HEIGHTS AND ANTHONY L. SCHREMMER, CHIEF OF POLICE OF THE SEASIDE HEIGHTS POLICE DEPARTMENT, DEFENDANTS.
Superior Court of New Jersey, Law Division Ocean County.
Decided December 17, 1990.
*64 Richard M. Eittreim, for plaintiff (McCarter & English, attorneys).
William T. Hiering, Jr., for defendants (Hiering, Hoffman, Garvey & Gannon, attorneys).
SERPENTELLI, A.J.S.C.
In this case the court is asked to decide whether a newspaper should be entitled to access to police reports concerning an alleged beating of a citizen by law enforcement officers or whether the need for confidentiality in the conduct of police affairs outweighs the public's right to know about the incident.
Plaintiff, Asbury Park Press, Inc., is the owner and publisher of a daily newspaper. Plaintiff's complaint alleges, on information and belief, that the Seaside Heights Police Department prepared reports concerning a beating of Jean-Philippe Van De *65 Wiele, which occurred on September 4, 1989. It is also alleged that on or about November 20, 1989, Van De Wiele filed a notice of claim against the Borough of Seaside Heights naming several law enforcement officers as participants in the beating. Finally, plaintiff asserts that around October 1990, the Borough of Seaside Heights entered into a settlement agreement with Van De Wiele in which the borough paid him approximately $250,000.
In its effort to publish information concerning the alleged beating and the reason for the subsequent settlement, plaintiff sought to inspect any and all reports on file with the Seaside Heights Police Department regarding the incident. Plaintiff's request for the documents was denied. This action ensued.
On the return date of plaintiff's order to show cause, plaintiff argued that the documents requested are accessible under both the Right to Know Law, N.J.S.A. 47:1A-1 et seq., and the common law. Plaintiff also contended that since all criminal and disciplinary investigations into the incident have been completed, the police investigatory process would not be compromised by the release. Defendants countered that the disclosure of the reports would "chill" the ability of police departments throughout the State to conduct internal investigations of incidents involving law enforcement officers. Defendants reasoned that those who prepare the reports would know that their comments could subsequently be opened to public view.
At the conclusion of oral argument, the court determined that it should conduct an in camera examination of the reports. Having completed its review, and having considered the balancing test dictated by the Supreme Court decisions discussed below, the court concludes that the reports should be released to plaintiff.
As noted, plaintiff rests its complaint on both the Right to Know Law and the common law right to know. Plaintiff first argues that police and investigative reports come within the definition of "public records" as contained in N.J.S.A. *66 47:1A-1 et seq. The Right to Know Law defines "public records" as:
... all records which are required by law to be made, maintained or kept on file by any board, body, agency, department, commission or official of the State or of any political subdivision thereof ... [N.J.S.A. 47:1A-2; emphasis supplied]
Except for those documents which are exempted from the Right to Know Law under N.J.S.A. 47:1A-2, every citizen of the State is entitled to inspect and copy any document included within the definition of a "public record." Clearly, the documents involved in this case are kept by a political subdivision of the State. The critical question then becomes whether the police reports are records which are "required by law to be made, maintained or kept on file."
In its brief, plaintiff relies on N.J.A.C. 13:57-1.1 et seq., to support the proposition that the reports are, in fact, public records under the statute. N.J.A.C. 13:57-1.2(a) regulates reporting responsibilities of a municipal full-time police department regarding offenses that have occurred within that municipality. At oral argument, however, plaintiff conceded that its reliance on the administrative regulation was tenuous at best and that its primary argument was based on the common law. Defendants responded that the documents sought by plaintiff are exempt from the Right to Know Law under Executive Order No. 9, issued by Governor Hughes on September 30, 1963, and Executive Order No. 123, issued by Governor Kean on November 12, 1985. Both orders direct that certain public documents are not subject to inspection, including fingerprint cards, plates, photographs and other similar criminal investigation records which are required to be made, maintained or kept by any state or local government agency [Executive Order No. 9, Paragraph 3(e); Executive Order No. 123, Paragraph 2(a)]. It is to be noted that Executive Order No. 123 modified Executive Order No. 9 by allowing the fingerprint cards, plates, photographs and similar investigation records to be made public as soon as practicable unless it shall appear that the release of any such information would jeopardize the safety of any person or investigation in progress or be otherwise *67 inappropriate. The term "as soon as practicable" is defined as generally meaning 24 hours.
Defendants' argument as to the applicability of this executive order is as tenuous as plaintiff's claim that the documents are required to be maintained under the Administrative Code. The orders refer to fingerprint cards, plates, photographs and similar criminal investigation records. The documents before the court are incident reports and statements of witnesses prepared by police officers which bear no similarity to fingerprint cards, plates or photographs. Furthermore, if the reports which the court has read in camera were deemed to be "similar" within the definition of the executive orders, plaintiff could argue that the provisions of paragraph 2(a) of Executive Order No. 123 expressly require that the documents be made public unless it would appear that they would jeopardize the safety of any person or any investigation in progress or otherwise be inappropriate. The court's review of those documents satisfies it that disclosure would in no way jeopardize the safety of any person, that no investigation is in progress and that it would not be otherwise inappropriate to release them under the terms of that executive order.
In any event, plaintiff is not able to direct the court to any requirement that the documents be maintained and thus the court must turn its focus to plaintiff's claim based upon the common law right to know. The common law definition of a public record is broader than that contained in the Right to Know Law. A public record under the common law is:
... one required by law to be kept, or necessary to be kept in the discharge of a duty imposed by law, or directed by law to serve as a memorial and evidence of something written, said, or done, or a written memorial made by a public officer authorized to perform that function, or a writing filed in a public office. The elements essential to constitute a public record are.... that it be a written memorial, that it be made by a public officer, and that the officer be authorized by law to make it. [Josefowicz v. Porter, 32 N.J. Super. 585, 591, 108 A.2d 865 (App.Div. 1954) (quoting 76 C.J.S., Records, § 1 at 112)]
Given this definition, the reports sought in this case are public records since they are written memorials made or *68 maintained by public officers who are authorized to do so. If these documents were required by law to be maintained, plaintiff would have had an absolute right to disclosure under the Right to Know Law. However, under the common law, a citizen's right to access to public documents rests upon a showing of a personal or particular interest in the material sought. Yet, even the existence of this interest does not give an absolute right to obtain the documents. The court must engage in a balancing test to determine whether the individual's right to the information outweighs the public's interest in confidentiality of the material. Nero v. Hyland, 76 N.J. 213, 222-224, 386 A.2d 846 (1978); McClain v. College Hosp., 99 N.J. 346, 354-355, 492 A.2d 991 (1985). Our Supreme Court has noted that most of the cases which have discussed the standard for determining a citizen's interest in access to documents have arisen in the context of a private need. Loigman v. Kimmelman, 102 N.J. 98, 104, 505 A.2d 958 (1986). The Court there commented that "[s]omewhat different but related considerations arise when the citizen seeks access to information to further a public good." Ibid. Those considerations are present in the case at hand.
The Loigman Court summarized the basic principles applicable to an effort to obtain disclosure of documents for the public good. It held that ordinarily, only an assertion of citizen or taxpayer status is necessary for the production of common law records, subject to a showing of good faith. Ibid. If the governmental need in confidentiality is slight or nonexistent, the citizen-taxpayer status will ordinarily warrant disclosure. Id. at 105, 505 A.2d 958 (citing Taxpayers Ass'n of Cape May v. City of Cape May, 2 N.J. Super. 27, 31, 64 A.2d 453 (App.Div. 1949)). However, when the interest in confidentiality is greater, the citizen's right of access must be qualified. In those circumstances, more than a citizen's status and good faith are necessary to require production of the documents. Indeed, the Court noted that a clear showing of a public need does not exist merely because a citizen claims that there may be something *69 corrupt which should be exposed for the benefit of the public. There is also a need to focus upon any negative effect that disclosure may have upon the public good. Loigman, 102 N.J. at 104-106, 108, 505 A.2d 958.
This court has already determined that an in camera inspection of the police reports was appropriate. In so doing, it followed the guidelines suggested in Loigman. Id. at 112-113, 505 A.2d 958. It must now determine whether it can appropriately release the materials in its possession. In this process, the court is mindful of the six considerations set forth in Loigman:
(1) the extent to which disclosure will impede agency functions by discouraging citizens from providing information to the government; (2) the effect disclosure may have upon persons who have given such information, and whether they did so in reliance that their identities would not be disclosed; (3) the extent to which agency self-evaluation, program improvement, or other decisionmaking will be chilled by disclosure; (4) the degree to which the information sought includes factual data as opposed to evaluative reports of policymakers; (5) whether any findings of public misconduct have been insufficiently corrected by remedial measures instituted by the investigative agency; and (6) whether any agency disciplinary or investigatory proceedings have arisen that may circumscribe the individual's asserted need for the materials. [Id. at 113, 505 A.2d 958]
In order to apply the principles suggested in Loigman and otherwise balance the respective interests involved in this case, it is important to understand the nature of the materials which this court has reviewed. They are comprised solely of either incident reports made by law enforcement officers involved in the episode or witness statements prepared by police officers. Both the incident reports and the witness statements are nothing more than a factual recitation of the maker's knowledge of the occurrence. There is no formal, comprehensive report in the sense that a person or group was commissioned to conduct a detailed investigation and report its findings. Moreover, the records do not disclose disciplinary charges brought against any of the law enforcement officers involved or charges pending against anyone else who may have participated in the altercation.
*70 Having described the nature of the documents, it is evident that when the Loigman criteria are applied to them, the reports should be disclosed. First, allowing access to the records will not impede agency functions by discouraging citizens from providing information since the statements given by the witnesses were no different in nature than those obtained at the scene of an automobile accident. It is unlikely that the citizen witnesses would have refused to cooperate because of the potential of disclosure. The law enforcement officers themselves, if requested, obviously have a duty to make the reports so that agency functions could not be hampered in that regard. Second, disclosure of this type of fact information by the citizen witnesses should not adversely impact upon them nor should they expect that either their identity or the documents would be protected. Again, they are the kind of statements taken in any incident investigation and there is no reasonable expectation of secrecy. Had a civil suit been instituted by the victim, it is likely that the statements would have been routinely discoverable. Third, it is difficult to argue that there would be a chilling effect upon the agency in its self-evaluation or program improvement. The reports would have been made whether or not they were used for self-critical analysis.
The thrust of the first three criteria is illustrated by Nero v. Hyland, supra. There, our Supreme Court found that the effectiveness of an investigation into a nominee's qualification for public office required that any individual interviewed be assured anonymity. That consideration outweighed the right of the nominee to know what was said about him and by whom. Those asked to evaluate an applicant's suitability for public office might feel threatened by the prospect that their responses would be made public, particularly if they are comments which are difficult to substantiate. In such cases, disclosure might inhibit candor and negatively affect the self-evaluation procedures. Those giving information about the alleged beating in this case were asked to do nothing more than to state facts, not opinions or impressions. A fact witness need not *71 fear being forthright and the self-evaluation process can only benefit from honesty.
The fourth criterion mentioned in Loigman, the degree to which the information sought includes factual data as opposed to evaluative reports of policymakers, is related to the third factor and seems particularly pertinent to this case. As noted, the documents before the court are nothing more than incident statements relating the maker's observation of or involvement in the affair. Since they are fact statements rather than evaluative reports, this consideration argues in favor of their release. Finally, the fifth and sixth criteria mentioned in Loigman have already been discussed. The court has not been informed of any remedial measures or disciplinary actions emanating from the event. Thus, based upon the criteria set forth in Loigman, plaintiff should prevail in its request for the release of the documents.
Beyond the Loigman criteria, this case brings into play broader considerations of the public's right to know. The pleadings suggest that law enforcement members have been involved in brutality and that they have made their peace with an innocent victim through a monetary settlement. All of this, if true, has occurred without any public knowledge of the circumstances of the incident, the reason for the alleged payment of $250,000 to the victim or an explanation as to why disciplinary proceedings were not pursued. The Right to Know Law reflects a fundamental tenet of our democratic society which encourages openness and discourages secrecy. The United States Supreme Court has said:
The generation that made the nation thought secrecy in government one of the instruments of Old World tyranny and committed itself to the principle that a democracy cannot function unless the people are permitted to know what their government is up to. [Environmental Protection Agency v. Mink, 410 U.S. 73, 105, 93 S.Ct. 827, 845, 35 L.Ed.2d 119, 142 (1973) (Douglas, J., dissenting)]
In addition to the Right to Know Law, the New Jersey Open Public Meetings Act (N.J.S.A. 10:4-6 et seq.) incorporates the same policy as does our Worker and Community Right to *72 Know Act (N.J.S.A. 34:5A-1 et seq.). Our decisional law has supported these principles:
... [I]n a democracy, the citizens generally have the right to know the truth about all parts of their government, because, without public knowledge of the realities of governmental activities, essential reforms of those activities will be hindered. [Stack v. Borelli, 3 N.J. Super. 546, 552, 66 A.2d 904 (Law Div. 1949)]
Public officials whether elected or appointed are fiduciaries of the public weal and are under an obligation to serve with the highest fidelity. They need to be free from corrupting influences and the public must be able to judge their work. In short, a public office is a public trust and it is only through knowledge that the public can know whether its trust has been properly served. Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433, 474-476, 86 A.2d 201 (1952); Aldom v. Roseland Bor., 42 N.J. Super. 495, 500, 127 A.2d 190 (App.Div. 1956). The court recognizes that there are circumstances, as in Nero, where the overriding need of confidentiality will outweigh the public's right to information. Those circumstances are not present here. To the contrary, plaintiff's and the public's right to know substantially outweighs any need to maintain secrecy in the documents sought. Therefore, the court directs that they be released to plaintiff.