797 A.2d 186 (2002)
351 N.J. Super. 110
The DAILY JOURNAL, Plaintiff-Appellant,
v.
POLICE DEPARTMENT OF THE CITY OF VINELAND; The Custodian of Records for Police Department of the City of Vineland; and City of Vineland, Defendants/Third-Party Plaintiffs-Respondents,
v.
Office of Cumberland County Prosecutor, and Arthur J. Marchand, Cumberland County Prosecutor, Third-Party Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued February 25, 2002.
Decided May 17, 2002.
*188 John C. Connell, Haddonfield, argued the cause for appellant (Archer & Greiner, attorneys; Mr. Connell, on the brief).
Richard J. Geiger, Bridgeton, argued the cause for respondents Cumberland County Prosecutor's Office and Arthur J. Marchand, Cumberland County Prosecutor (Mr. Geiger, on the brief).
Arlene M. Turinchak, Somerset, argued the cause for amicus curiae New Jersey Press Association (McGimpsey & Cafferty, attorneys; Ms. Turinchak and Thomas J. Cafferty, on the brief).
Respondents Police Department of the City of Vineland, Custodian of Records for Police of City of Vineland, and City of Vineland, have not filed briefs.
Before Judges HAVEY, BRAITHWAITE and WEISSBARD.
*187 The opinion of the court was delivered by HAVEY, P.J.A.D.
Plaintiff, the Daily Journal, a daily newspaper published in Vineland, appeals from a summary judgment dismissing its complaint in lieu of prerogative writs, in which it sought access to certain investigation reports of the Vineland Police Department concerning allegations of wrongdoing by the Vineland Road Department. The allegations of wrongdoing were the subject of a presentment returned by the Cumberland County Grand Jury. Judge Francis found that the investigation reports sought by plaintiff did not constitute public records pursuant to the Right-to-Know Law (RTKL), N.J.S.A. 47:1A-1 to -4, and that, under the common law right of access, the need for confidentiality outweighed plaintiff's interest in disclosure. Specifically, the judge was persuaded that the policy of confidentiality underlying the filing and return of a grand jury presentment outweighed the public's right to know the details of the investigation. We agree and affirm.
The essential facts are not in dispute. On August 15, 1996, the Police Department of the City of Vineland (the police department) began investigating Vineland's Road Department with respect to *189 allegations dating back to November 1995, regarding the misappropriation of public funds by the wrongful ordering of parts to be used on the personal vehicle of the garage supervisor. Approximately ten police officers were put on the case. The investigation included the questioning of fifty-seven witnesses, some in tape-recorded interviews, and the collection of numerous photographs and documents. Factual information was memorialized in written investigation reports prepared by members of the police department. The investigation concluded in September 1996.
The matter was then forwarded to the Cumberland County Prosecutor who impaneled a grand jury to examine the same allegations to see if there was probable cause for criminal charges. A grand jury was impaneled in March 1997. The grand jury ultimately issued a presentment, which was then revised to delete certain information. The grand jury proceedings concluded in February 1998.
None of the police records prepared in 1996 were compiled pursuant to the grand jury investigation or pursuant to any other law enforcement agency's request. That is, the police file was prepared before the grand jury convened and independently of the grand jury's investigation. The records consisted of two or three folders, containing a total of 200 to 500 pieces of paper. The reports prepared by the police officers contained "just the facts" and did not include any evaluative material. Chief Brunetta testified during his deposition that "[p]eople were interviewed and they gave us information that caused us to pick up other people that were interviewed and so forth." The police department had no current intention to conduct any further investigation regarding these allegations, and all indictments had been concluded.
The chief of police admitted that his department was not an arm of the grand jury, and that the release of the police records would not endanger any police officer. Also, the chief admitted that the records did not contain any information describing the deliberations of the department or an assessment of the department's operations. However, he believed that it was possible that the files contained the names of individuals as to whom supplementary investigation revealed no evidence of wrongdoing.
Following the conclusion of the grand jury proceedings, five municipal employees were arrested on criminal charges, without indictment. They all applied for and were accepted into pretrial intervention. Another municipal employee was indicted by the grand jury, tried, and acquitted.
According to Judge Francis[1] the grand jury investigation was limited in its testimonial presentation to the police officers who had conducted the investigation. That is, the officers testified regarding the contents of their police reports and no independent witnesses who had been interviewed by the officers were called to testify.
The initial presentment returned by the grand jury was reviewed by Judge Francis, in his role as acting assignment judge, to see if it contained any scandalous or other improper material, in accordance with Rule 3:6-9. After striking objectionable matter, he referred the names of three of the public officials named in the presentment back to the grand jury for consideration of whether an indictment *190 should be returned. As noted, only one of these officials was actually indicted.
The judge also redacted the names of any private citizens named in the presentment, concluding that they should be dealt with instead by way of indictment or disorderly persons complaints, because presentments were to be limited to public employees and public officials. The trial judge did not conclude that these private citizens had done nothing wrong; rather, he concluded only that they should not be named in the presentment.
Judge Francis conducted an in camera hearing respecting the three public officials named in the presentment. R. 3:6-9(c). He concluded that there was insufficient evidence to support the censuring of two of the public officials. As to the third official, since the evidence was sufficient only as to parts of the presentment, the judge further edited it.
In the final presentment, as edited by Judge Francis, it was noted that the police department had interviewed current employees of the Road Department, vendors who supplied goods and services to Vineland, private homeowners who received services from the Road Department, the Business Administrator of Vineland, and others.
The grand jury found that violations had occurred with respect to the: ordering of parts and materials by the Road Department which were converted for personal use; trimming of trees on private property; supplying of topsoil purchased by the Road Department for the benefit of private citizens; delivery of stone and gravel to private residences using the Road Department's staff and equipment; maintenance of personal vehicles by the Road Department's garage; installation of pipe and diversion of a stream on private property; use of only one primary vendor for all business with the Road Department; abuse of time cards and overtime logs; and performance of work during regular business hours using City material for the benefit of a former mayor.
The grand jury concluded that the Road Department was seriously mismanaged, that many employees felt their jobs would be in jeopardy if they did not follow the directions of certain supervisors, and that there were no checks and balances to establish whether property was being converted to personal use or to prevent the mismanagement which prevailed.
More disturbing was the apparent ability of one employee to intimidate other employees, and supervisors by his perceived political connection to politicians within the city government. It was difficult for us as grand jurors in some instances to determine whether or not specific wrongful acts were at the direction of a politician or this employee[']s perceived authority. This perception, whether real or not, should not have been permitted to exist and it was incumbent upon those elected officials of the city government to see that it did not.
Numerous exhibits were attached to the presentment. The investigative reports of the police officers who testified before the grand jury were not among them.
Despite Judge Francis' efforts at redaction, the press nevertheless discovered the names of many of the private citizens who had originally been named in the presentment. According to Deborah Marko, a reporter for plaintiff, the allegations and ensuing investigations generated an enormous amount of publicity and resulted in forty-two articles being published by plaintiff between August 1996 and January 1999. However, the actual details of what had occurred and who was involved was never revealed to the public, and the redacted *191 presentment failed to detail the full scope of the corruption. It was plaintiff's contention that politically connected people had been protected. Plaintiff thus alleged that the public needed access to the police files in order to safeguard against future criminal activity and abuse of the taxpayers' trust, and in order to allow the public to form their own opinions regarding the conduct, the investigations, and the prosecution.
Plaintiff's efforts to obtain the investigation reports were rebuffed. According to the prosecutor, at the conclusion of the grand jury proceedings, the trial judge had directed him not to release any other information absent further order of the court.
In ruling on the summary judgment motions, Judge Francis first concluded that plaintiff had no statutory right to the reports because they were not public records within the RTKL. Specifically, the court found that there was no requirement that these reports be "made, maintained or kept on file."
As to plaintiff's common-law right to access, the judge concluded that plaintiff's interest in disclosure was outweighed by the public's right to confidentiality. He noted the uniqueness of the presentment procedure, which, according to him, was intended to protect those individuals who were not shown to have committed any indictable offense or any other noncriminal wrongdoing related to public affairs. Because a presentment besmirched the reputation and impugned the integrity of someone who had no opportunity to defend himself, criticism was allowed only where the individual's conduct was integrally associated with the public affairs which prompted the investigation. The judge ultimately viewed the case as one of fairness. In his opinion, if the police reports were revealed, they would be "one-sided" because no one would ever know what was before the grand jury and because the other side had no opportunity to be heard. "[S]o that somebody isn't wrongfully besmirched by the eyes and ears of the public, purposely, inadvertently, or otherwise, at least on a one-sided consideration," the judge denied the application.

I
Under the Right-to-Know Law, N.J.S.A. 47:1A-1 to -4, "New Jersey citizens have an absolute right to inspect, copy, or purchase records `required by law to be made, maintained or kept on file' by public officials." Home News v. State, Dep't of Health, 144 N.J. 446, 453, 677 A.2d 195 (1996) (quoting N.J.S.A. 47:1A-2). Plaintiff first argues that it has a statutory right of access to the investigatory files pursuant to the RTKL because the documents constitute "public records" within the meaning of that statute. We disagree.
The RTKL applies to "all records which are required by law to be made, maintained or kept on file" by a public body.[2]N.J.S.A. 47:1A-2. That definition of public records should be strictly construed. Keddie v. Rutgers, State Univ., 148 N.J. 36, 46, 689 A.2d 702 (1997); Higg-A-Rella, Inc. v. County of Essex, 141 N.J. 35, 44, 660 A.2d 1163 (1995). "[N]ot every record held by a public agency is a record that is required to be `made, *192 maintained or kept' on file." North Jersey Newspapers Co. v. Passaic County Board of Chosen Freeholders, 127 N.J. 9, 16, 601 A.2d 693 (1992). We have found no case holding that criminal investigation reports are public records under the RTKL. Indeed, the courts have held to the contrary, on the basis that no law or regulation requires the making, maintaining or keeping on file the results of a criminal investigation by a law enforcement officer or agency. See State v. Marshall, 148 N.J. 89, 272, 690 A.2d 1 (holding that no law or regulation requires that law enforcement files be made, maintained or kept), cert. denied, 522 U.S. 850, 118 S.Ct. 140, 139 L.Ed.2d 88 (1997); accord River Edge Sav. & Loan Ass'n v. Hyland, 165 N.J.Super. 540, 545, 398 A.2d 912 (App.Div.) (holding that "research ... has failed to disclose, any law which requires the making, maintaining or keeping on file the results of an investigation by a law enforcement official or agency into the alleged commission of a criminal offense"), certif. denied, 81 N.J. 58, 404 A.2d 1157 (1979); see also Shuttleworth v. City of Camden, 258 N.J.Super. 573, 580-81, 610 A.2d 903 (App.Div.) (same), certif. denied, 133 N.J. 429, 627 A.2d 1135 (1992); Asbury Park Press, Inc. v. Borough of Seaside Heights, 246 N.J.Super. 62, 66-68, 586 A.2d 870 (Law Div.1990) (same).
We reject plaintiff's contention that N.J.S.A. 40:48-6 and N.J.S.A. 40A:14-118 require that police reports be made, maintained or kept on file by law enforcement officials. N.J.S.A. 40:48-6 merely provides how, when a town maintains a municipal building, governmental material shall be kept in order to secure the material against fire and ordinary theft. See Shuttleworth, supra, 258 N.J.Super. at 580, 610 A.2d 903. N.J.S.A. 40A:14-118 is inapplicable because it provides only for the creation of a police force and for the maintenance, regulation and control thereof. Nothing in the statute requires police departments to keep or maintain investigation reports generated by police officers.[3] We therefore conclude that the criminal investigation reports are not public records under the RTKL.

II
Plaintiff argues that the trial judge erred in rejecting its claim for access to the investigation reports under the common law right to know. Plaintiff contends that the court erred in concluding that plaintiff's interest in the reports was outweighed by the need for confidentiality. We disagree.
The common law makes a much broader class of documents available than the RTKL, but on a qualified basis. Home News, supra, 144 N.J. at 453, 677 A.2d 195; Higg-A-Rella, supra, 141 N.J. at 46, 660 A.2d 1163. Public records available for inspection under the common law include any records made by public officers in the exercise of their functions. Higg-A-Rella, supra, 141 N.J. at 46, 660 A.2d 1163. As such, they include almost every document recorded, generated, or produced by public officials, whether or not required by law to be made, maintained, or kept on file. Ibid.; Shuttleworth, supra, 258 N.J.Super. at 582, 610 A.2d 903. Under this definition, there is no dispute in this case that the police investigative files and reports sought here were public records *193 under the common law. See id. at 583, 610 A.2d 903.
Nevertheless, the person seeking access must establish an interest in the subject matter of the material. Higg-A-Rella, supra, 141 N.J. at 46, 660 A.2d 1163. Plaintiff's standing is not disputed. A citizen, and the press on its behalf, does not have to prove any personal interest in order to satisfy the common law standing requirement. Shuttleworth, supra, 258 N.J.Super. at 583, 610 A.2d 903. A newspaper's interest in keeping a watchful eye on the workings of public agencies is sufficient to accord standing. Home News, supra, 144 N.J. at 454, 677 A.2d 195; Shuttleworth, supra, 258 N.J.Super. at 583, 610 A.2d 903. Defendants do not contend otherwise.
Once a court determines that a plaintiff has standing and the documents sought are public records, it must engage in balancing plaintiff's interest in the information against the public interest in confidentiality of the documents, including a consideration of "whether the demand for inspection is `premised upon a purpose which tends to advance or further a wholesome public interest or a legitimate private interest.'" Loigman v. Kimmelman, 102 N.J. 98, 112, 505 A.2d 958 (1986) (quoting City of St. Matthews v. Voice of St. Matthews, Inc., 519 S.W.2d 811, 815 (Ky. 1974)). The standard is flexible and adaptable, Loigman, supra, 102 N.J. at 103, 505 A.2d 958, and calls for an "exquisite weighing process" by the trial court. Beck v. Bluestein, 194 N.J.Super. 247, 263, 476 A.2d 842 (App.Div.1984). Factors for a court to consider in engaging in the balancing process include the following:
(1) the extent to which disclosure will impede agency functions by discouraging citizens from providing information to the government; (2) the effect disclosure may have upon persons who have given such information, and whether they did so in reliance that their identities would not be disclosed; (3) the extent to which agency self-evaluation, program improvement, or other decisionmaking will be chilled by disclosure; (4) the degree to which the information sought includes factual data as opposed to evaluative reports of policy-makers; (5) whether any findings of public misconduct have been insufficiently corrected by remedial measures instituted by the investigative agency; and (6) whether any agency disciplinary or investigatory proceedings have arisen that may circumscribe the individual's asserted need for the materials.
[Loigman, supra, 102 N.J. at 113, 505 A.2d 958.]
The court should balance these and any other relevant factor against the importance of the information sought to the plaintiff's vindication of a public interest. Ibid.
Applying these factors here, the trial judge found that only one would weigh in favor of nondisclosure. That is, the judge found that, with respect to remedial measures the City might take as a result of the investigation, plaintiff did not need the police reports in order to find out whether any of the grand jury's recommendations for remediation had been carried out. Four factors weighed in favor of disclosure. That is, the judge found that: (1) disclosure would not impede any investigation; (2) none of the witnesses interviewed by the police had asked for confidentiality; (3) disclosure would not chill the efforts of the police department to investigate other matters; and (4) the reports being sought were factual and not self-evaluative. However, as noted, he relied on the unique nature of the presentment process and its capacity to destroy the reputation of those who have not had an opportunity to defend *194 themselves, and concluded that fundamental fairness in getting "both sides" of the story to the public demanded that the police reports remain confidential.
Rule 3:6-7 implements the historical requirement as to the secrecy of grand jury proceedings by expressly requiring all persons present during the proceedings, except witnesses, to take an oath of secrecy. The rule is subject to Rule 3:13-3 which permits discovery. It has long been recognized that the proper function of our grand jury system depends upon the secrecy of the proceedings. Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211, 218, 99 S.Ct. 1667, 1672, 60 L.Ed.2d 156, 164 (1979); United States v. Procter & Gamble Co., 356 U.S. 677, 681, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077, 1081 (1958). As the United States Supreme Court noted in Douglas, supra, there are:
several distinct interests served by safeguarding the confidentiality of grand jury proceedings. First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements.
[441 U.S. at 218-19, 99 S.Ct. at 1672, 60 L.Ed.2d at 165.]
Another reason for confidentiality is to protect innocent persons whose names have been mentioned but have not been charged. State v. Kearney, 109 N.J.Super. 502, 506, 263 A.2d 817 (Law Div.1970). Consequently, there must be a "strong showing of particularized need" before grand jury material is disclosed. See State v. Doliner, 96 N.J. 236, 245, 475 A.2d 552 (1984); and see Doe v. Klein, 143 N.J.Super. 134, 140, 362 A.2d 1204 (App.Div. 1976).
Plaintiff argues that the historical secrecy attached to grand jury proceedings is not applicable here because the investigation reports it seeks were prepared prior to and independent of the grand jury proceedings. Citing federal precedent, plaintiff contends that the reports are not confidential because they do not constitute "matters occurring before the grand jury." See In re Grand Jury Matter (Appeal of Catania), 682 F.2d 61, 64 (3rd Cir.1982) (the federal grand jury secrecy rule, (Rule 6(e)), did not preclude "`disclosure of information obtained from a source independent of the grand jury proceedings'") (quoting In re Grand Jury Investigation, 610 F.2d 202, 217 (5th Cir.1980)); Blalock v. United States, 844 F.2d 1546, 1551 (federal secrecy rule was not violated when FBI interviewed potential grand jury witnesses in the presence of third parties even if the same information is later presented to the grand jury), reh'g denied, 856 F.2d 200 (11th Cir.1988); In re Grand Jury Investigation, supra, 610 F.2d at 216-17 (same).
However, the federal rule is not entirely settled. Other courts have held that the grand jury secrecy rule, Rule 6(e), applies not only to information drawn from grand jury proceedings, but also to any other source which may reveal what in fact occurred during the grand jury proceedings. In re Grand Jury Investigation, supra, 610 F.2d at 216-17. For example, in In re Grand Jury Matter, 697 F.2d 511, 512 (3rd Cir.1982), the Third Circuit held that disclosure of the contents of interviews of prospective grand jury witnesses "reveals the contents of grand jury proceedings" because there is "[n]o meaningful distinction... between transcripts and witness interviews conducted outside the grand jury's presence but presented to it." In *195 this case, according to Judge Francis, the evidence presented to the grand jury was limited to the testimony of the police officers who "provided the content of their reports to the grand jurors." Therefore, application of the federal precedent cited by plaintiff is open to debate.
In any event, the trial court acknowledged the federal precedent, but found significant that this case implicated the presentment process, which, by its nature, entails the investigation of private individuals whose names were disclosed in both the investigation reports and grand jury proceedings. The judge viewed the grand jury's function in returning a presentment under Rule 3:6-9 was to focus on "public affairs and public official involvement in those public affairs, not private citizen involvement in such matters." Therefore, he redacted the names of the private citizens mentioned in the initial presentment, but stressed that those individuals named in the initial presentment may be subject to criminal prosecution, independent of the presentment, in the event the prosecutor determines that further proceedings are justified.
At common law the term "presentment by a grand jury" was generally intended to mean the finding of a grand jury with respect to matters of public interest or affairs "or to some public evil or condition to which, in the discretion of the jury, the attention of the community should be directed." In re Presentment by Camden Cty. Grand Jury, 34 N.J. 378, 391, 169 A.2d 465 (1961). See also In re Presentment by Camden Cty. Grand Jury, 10 N.J. 23, 35, 89 A.2d 416 (1952). When discreetly used, a presentment serves the public interest. It refers "to public affairs or conditions, and even if they occasionally censure public officials whose association with the deprecated public affairs or conditions is intimately and inescapably a part of them." In re Presentment by Camden Cty. Grand Jury, supra, 34 N.J. at 389, 169 A.2d 465. Rule 3:6-9(a), defining the presentment procedure, incorporates this common law purpose by focusing on matters of public concern. It states: "A presentment may ... refer to public affairs or conditions, but it may censure a public official only where that public official's association with the deprecated public affairs or conditions is intimately and inescapably a part of them." (Emphasis added).
The procedure outlined by Rule 3:6-9(c) underscores the need for confidentiality and a careful examination of the findings of the grand jury before publication of the presentment. After review, the assignment judge shall refer the presentment, with appropriate instructions, back to the jury if it appears that a crime has been committed. Further:
If a public official is censured the proof must be conclusive that the existence of the condemned matter is inextricably related to non-criminal failure to discharge that public official's public duty. If it appears that the presentment is false, or is based on partisan motives, or indulges in personalities without basis, or if other good cause appears, the Assignment Judge shall strike the presentment either in full or in part. As an aid in examining the presentment the Assignment Judge may call for and examine the minutes and records of the grand jury, with or without the aid of the foreperson or the prosecuting attorney, to determine if a substantial foundation exists for the public report.
[Ibid.]
If the presentment is not stricken, the presentment is served upon the public official who has been censured, who may move for an in camera hearing during which the official may present "additional evidence to expose any deficiency." Ibid. Thereafter, *196 the presentment "shall be filed and made public." R. 3:6-9(d).
The historical justification for the high degree of proof required for censuring is that:
"a presentment is sometimes a cruel thing.... Where a presentment besmirches the reputation of a man he has not the opportunity to justify himself....
A grand jury should be particularly careful in its presentment never to charge an individual with a wrong act that is detrimental to his character unless the proof is absolutely conclusive."
[In re Presentment of Bergen Cty. Grand Jury, 193 N.J.Super. 2, 8, 471 A.2d 1203 (App.Div.1984) (quoting Charge to Grand Jury, 30 N.J.L.J. 306, 307 (O & T 1907)).]
In In re Presentment by Camden Cty. Grand Jury, supra, 34 N.J. at 389-90, 169 A.2d 465, the Supreme Court succinctly stated the fundamental reason for restraint as follows:
When an indictment is returned, the official becomes entitled to a trial. He has an opportunity to face his accusers and to achieve public exoneration from a court or jury. Not so with a presentment. It castigates him, impugns his integrity, points him out as a public servant whose official acts merit loss of confidence by the people, and it subjects him to the odium of condemnation by an arm of the judicial branch of the government, without giving him the slightest opportunity to defend himself.
We agree with Judge Francis that because of the nature of the grand jury presentment process, the public right to confidentiality respecting the investigation reports outweigh plaintiff's right to access. The balancing process must be "flexible and adaptable to different circumstances and `sensitive to the fact that requirements of confidentiality are greater in some situations than in others.'" Loigman, supra, 102 N.J. at 103, 505 A.2d 958 (quoting McClain v. College Hosp., 99 N.J. 346, 362, 492 A.2d 991 (1985)). Preliminarily, we reject plaintiff's argument that the investigation reports were unrelated to the hearings before the grand jury. Essentially, the contents of the reports constituted the entire factual basis for the grand jury's determination to return a presentment. Judge Francis, who examined the grand jury minutes and testimony stated:
[The police reports] pretty much said what ended up in the grand jury presentment, from a factual standpoint; not from a name standpoint or location standpoint; what's contained in those police reports. Because that's what got presented to the grand jury. I'm not trying to bootstrap anybody, just stating a fact. In other words, the 57 witnesses allegedly talked to by the police were not called before the grand jury. The police were called before the grand jury, they read their reports. I'm paraphrasing it.
Consequently, the investigation reports and the grand jury testimony were inextricably related and cannot be separated for purposes of a common-law right to access analysis. See In re Grand Jury Investigation, supra, 610 F.2d at 216-17.
The examination of the presentment by Judge Francis in his capacity as acting assignment judge required him to consider the right of private individuals named in the presentment to a measure of confidentiality. The central purpose of the presentment related "to some public evil ... to which, in the discretion of the jury, the attention of the community should be directed" and the censure of a public official if there was conclusive proof that his conduct was "inextricably related to the non-criminal *197 failure to discharge his public duty." In re Presentment by Camden Cty. Grand Jury, supra, 34 N.J. at 391, 169 A.2d 465. That purpose was achieved in that the grand jury identified the public officials and employees involved and a pattern of noncriminal conduct on the part of those officials and employees. We concur in the judge's determination that identity of the private citizens who may have benefitted from the wrongdoing was not necessarily critical to the grand jury's assigned task. Significantly, neither the State nor any other aggrieved party challenged the judge's redaction. See Rule 3:6-9(e) (the action taken by the assignment judge, judicial in nature, "is subject to review for abuse of discretion by the State or by any aggrieved person, including any member of the grand jury making the presentment").
Further, the judge was properly sensitive to the undeniable effect disclosure of the names would have on the private citizens. To disclose the names is tantamount to an accusation, "but furnishes no forum for a denial." In re Presentment by Camden Cty. Grand Jury, supra, 34 N.J. at 390, 169 A.2d 465. "`The injury it may unjustly inflict may never be healed.'" Ibid. (quoting People v. McCabe, 148 Misc. 330, 266 N.Y.S. 363, 367 (Sup.Ct.1933)). Without the judge's intervention in redacting the names from the presentment, these individuals would have had no forum to deny the implied charge of wrongdoing contained in a decree issued by an arm of the judicial branch of the government. Ibid. Essentially, it would have deprived the individuals of "the right to answer and to appeal." Ibid.
Indeed, disclosure of the reports, essentially constituting the disclosure of the facts contained in the grand jury transcripts, would create an anomaly. Pursuant to Rule 3:6-9(c), a censured public official is entitled to a hearing to clear his or her name before the presentment is made public. No such right is afforded to a private citizen who is named in the presentment but who was not charged with a criminal offense. Judge Francis observed that, for that reason alone, he would have redacted the names of the private citizens had he concluded that the investigation reports were public records and released them. See South Jersey Publ'g Co. v. N.J. Expressway Auth., 124 N.J. 478, 488-89, 591 A.2d 921 (1991); Loigman, supra, 102 N.J. at 113, 505 A.2d 958.
Shuttleworth, supra, 258 N.J.Super. at 581, 610 A.2d 903 and Asbury Park, supra, 246 N.J.Super. at 67, 586 A.2d 870, cited by plaintiff, are distinguishable. In Shuttleworth, the issue was whether the press was entitled to access under the common law to police files and an autopsy report relating to the shooting death of a suspect while in custody. 258 N.J.Super. at 577, 610 A.2d 903. The police were not charged with any offense as a result of the incident. Ibid. We remanded with direction that the trial court review in camera all of the documents in the police file, make appropriate redactions and then engage in the common law balancing test. Id. at 590, 610 A.2d 903. In Asbury Park, the Law Division ordered release under the common law of police reports prepared by the Seaside Heights Police Department concerning the alleged beating of a citizen by Seaside Heights police officers. 246 N.J.Super. at 71, 586 A.2d 870. The Law Division found that the public had a right to know about an incident of "brutality" and why the Borough settled a resulting civil action but did not initiate disciplinary proceedings. Ibid. Neither case involved grand jury proceedings or a presentment. Consequently, in neither case was the court called upon to consider the interplay of the confidentiality of grand jury proceedings *198 and the sensitive nature of the presentment process.
Finally, in engaging in the common-law balancing process, significance must be given to the Legislature's recent amendments to the RTKL, L. 2001, c. 404. That enactment, effective July 8, 2002 (c. 404, § 18), repeals N.J.S.A. 47:1A-2, which defined "public records" as "all records which are required by law to be made, maintained or kept on file...." See c. 404, § 17. N.J.S.A. 47:1A-1.1, the definition section of the RTKL, is amended by c. 404, § 2, to include the definition of "government record[s]," meaning any "document ... that has been made, maintained or kept on file in the course of [the agency's] official business... or ... received in the course of [the agency's] official business...." This definition is obviously much broader than the definition of "public records" under N.J.S.A. 47:1A-2.
However, a "criminal investigatory record" is excepted from the definition of "government record[s]" and is "deemed confidential." c. 404, § 2. A "criminal investigatory record" means "a record which is not required by law to be made, maintained or kept on file that is held by a law enforcement agency which pertains to any criminal investigation...." Ibid. Nevertheless, c. 404, § 5b, permits public access to specific "information concerning a criminal investigation ... where a crime has been reported but no arrest yet made," and "if an arrest has been made...." Finally, c. 404, § 9 provides that nothing in the newly-enacted amendments "shall be construed as limiting the common law right of access to a government record."
Thus, effective July 8, 2002, criminal investigatory reports are excepted from the definition of "government record[s]" and are "deemed confidential." Although c. 404, § 5b, permits public access to specific "information concerning a criminal investigation," nothing in that section requires access to the names of private citizens who are not charged with an offense. In our view, the enactment is a clear legislative acknowledgment that a compelling public interest is served by protecting the private interests of such citizens. We deem that legislative declaration to be highly relevant to the "exquisite weighing process" under the common law. Beck, supra, 194 N.J.Super. at 263, 476 A.2d 842.

III
Plaintiff argues that it has a federal and state constitutional right of access to the documents in question. We disagree.
The trial judge did not give much credence to plaintiff's constitutional argument, stating simply that the cases relied upon by plaintiff all dealt with access to court proceedings, not access to police reports of investigations. We agree. Plaintiff cannot point to any case which establishes that either the First Amendment or New Jersey's corresponding constitutional provision guaranteeing free speech and free press, N.J. Const. art. I, ¶ 6, requires that the media be given access to police investigative files. See Marshall, supra, 148 N.J. at 268-69, 690 A.2d 1 (there is no general constitutional right to discovery in criminal cases); Shuttleworth, supra, 258 N.J.Super. at 596, 610 A.2d 903 (nothing in First Amendment case law requires disclosure of police investigative files).
Amicus, New Jersey Press Association, makes the additional argument that the judge's denial of access based upon a fear of one-sided reporting effects an unconstitutional prior restraint. While we agree with Amicus that the fear of one-sided reporting is not a valid reason to deny disclosure of public records, the central *199 basis for denying disclosure expressed by the judge was that, to do so, would undermine the confidentiality underlying the grand jury presentment process, not to restrain free speech.
Affirmed.
WEISSBARD, J.A.D., concurring.
In my view, the outcome of this case is dictated by the fact that the trial judge, during the course of argument below, revealed that the police investigative reports now being sought by plaintiff formed the basis of the police officers' testimony before the grand jury. By making this revelation, the trial judge inadvertently opened the door to a breach of the secrecy accorded grand jury proceedings. Having done so, disclosure of those reports at this time would certainly result in plaintiff being permitted to walk through that open door.
Although a criminal defendant gains unfettered access to the grand jury proceedings which result in his or her indictment, R. 3:6-6(b), and grand jury witnesses are not bound by the oath of secrecy (thereby permitting them to disclose their own testimony), R. 3:6-7, disclosure to others is subject to court approval based on "a strong showing of particularized need that outweighs the interest in grand jury secrecy." State v. Doliner, 96 N.J. 236, 246, 475 A.2d 552 (1984). Nevertheless, as Judge Stern noted in Shuttleworth v. City of Camden, 258 N.J.Super. 573, 585 n. 6, 610 A.2d 903 (App.Div.), certif. denied, 133 N.J. 429, 627 A.2d 1135 (1992), "our case law has with increasing frequency expanded the right of victims and some other persons with particular interest to gain access to [grand jury testimony] after completion of the criminal case." Here, while plaintiff does not seek the grand jury testimony, access to the investigative reports would, as a result of the disclosure by the trial judge, reveal evidence that was presented to the grand jury. Given existing law on grand jury secrecy, see Doliner, supra, at 246-49, 475 A.2d 552; see also Butterworth v. Smith, 494 U.S. 624, 629-30, 110 S.Ct. 1376, 1379-80, 108 L.Ed.2d 572, 580 (1990), the denial of plaintiff's request for access can be justified.
If, however, the judge had not made the revelation, I would find that the material in question should be disclosed to the press. It is in this respect that I part company with the majority. The investigative reports at issue were developed independent of, and substantially before, the grand jury proceeding which resulted in the presentment. In the ordinary course of events, such records are not covered by the rule of grand jury secrecy, as the cases cited by the majority explain.
Examination of the factors governing common law access set forth in Loigman v. Kimmelman, 102 N.J. 98, 113, 505 A.2d 958 (1986), reveals that every applicable one weighed in favor of disclosure in this case. Only "the unique nature of the presentment process and its capacity to destroy the reputation of those who have not had an opportunity to defend themselves," 351 N.J.Super. at 123, 797 A.2d at 193, is found to outweigh the public's right to access. However, I see little difference in this regard between a grand jury proceeding resulting in an indictment and one resulting in a presentment.
An indicting grand jury may hear about the activities of individuals who ultimately are not indicted, but there is generally no prohibition on the indicted individual revealing the contents of grand jury testimony (or investigating police reports) once they are turned over in discovery. In fact, in a highly unusual move, the trial judge ordered that the one individual who was indicted by this grand jury could not even have access to grand jury testimony, or related materials, but, rather, such access *200 would be limited to his attorney and office staff and could only be released to or even discussed with the defendant upon prior court approval on motion in camera. Presumably, this extraordinary order was entered because the same grand jury had also issued a presentment.
In my view, this unique order of confidentiality only emphasizes the anomaly of creating a special role for presentment grand juries. Without that order, in this case as well as in the ordinary case of an indicting grand jury, the names of possibly innocent, or at least unindicted, people may become known to the public, including the press. As noted earlier, witnesses are also free to reveal the content of their testimony. Indeed, with respect to completed grand jury proceedings, the witness's First Amendment right to freedom of speech prohibits state action that would seek to prevent such disclosure. Butterworth, supra. In fact, if there had been no presentment in this case, I assume no one would quarrel with plaintiff's request. Yet, the very police reports that plaintiff would have obtained in such event would reveal the names of individuals never charged with wrongdoing. Thus, given the myriad situations in which information about unindicted or "innocent" persons may become public I see no reason to differentiate a grand jury issuing a presentment from any other grand jury, despite the unique nature of the presentment process.
The overriding concern of the trial judge and the majority appears to be "the undeniable effect disclosure of [the names of private citizens who may have benefitted from the wrongdoing of public officials] would have on the private citizens" 351 N.J.Super. at 129, 797 A.2d at 197. To disclose the names, the court reasons, would be "tantamount to an accusation" without a "forum for a denial." Ibid. (quoting In re Presentment by Camden Cty. Grand Jury, 34 N.J. 378, 390, 169 A.2d 465 (1961)). However, that approach assumes that the press, armed with the names of these private citizens, will publish those names, en masse, without consideration of whether such publication, in the case of any particular individual, will further the public good. It is a sometimes regrettable fact that the press acts irresponsibly and may thereby cause damage to the reputations of people who have done no wrong. But the possibility of such irresponsible action by some segments of the media cannot be elevated to a presumption against the entire news-gathering profession. The risk of reputational injury is part of the price we pay for living in a free society, with a free press guaranteed under our Constitution. I agree with plaintiff that we must have faith in the motivation of the press to act consistent with its highest standards and, even more importantly, the ability of the public to sort out the information provided. In this case, the public's right to be informed of questionable activities on the part of elected or appointed officials, or by private citizens with special access to those in public office, must override any risk of harm to particular individuals. In that regard, I see no basis for the State's position that if disclosure were ordered, it would be necessary to redact the names of private citizens and public officials not mentioned in the presentment. Such an exercise would render the disclosure of the reports a practical nullity.
If the trial judge had not by his disclosure compromised the grand jury secrecy, I would find that the police investigative reports sought by plaintiff should have been disclosed. Regrettably, but consistent with the overriding principle of grand jury secrecy, the only way to remedy the erroneous disclosure appears to be the unintended result of denying access. Although *201 I consider it a close question, if grand jury secrecy should give way to disclosure in these unusual circumstances, I believe it is for the Supreme Court to make that determination.
NOTES
[1] Judge Francis, in ruling on the summary judgment motions, noted that he had been the acting assignment judge during the tenure of the grand jury investigation and the return of its presentment. He therefore had personal knowledge of the facts of the case and supplemented the record in that regard.
[2] N.J.S.A. 47:1A-2 has been repealed by L. 2001, c. 404, § 17, effective July 8, 2002. Chapter 404, § 2, amends N.J.S.A. 47:1A-1.1, the definition section of the RTKL. The amendment defines "government record[s]" subject to public access, but excepts "criminal investigatory record[s]" from the definition of "government record[s]." See discussion infra at page 198.
[3] The Executive Orders cited by plaintiff do not support its claim that reports of criminal investigations are required to be made, kept, or maintained by law enforcement officers or agencies. See Executive Order No. 9, 1963 New Jersey Laws 1153 (Sept. 30, 1963); Executive Order No. 123, 1985 New Jersey Laws 2290 (Nov. 12, 1985), and Executive Order No. 69, 29 N.J.R. 2729 (July 7, 1997).