NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2523-14T1

NORTH JERSEY MEDIA GROUP, INC.,

    Plaintiff-Respondent,

v.

TOWNSHIP OF LYNDHURST, HELEN
POLITO, RMC, in her capacity
as the Custodian of Records for
the Township of Lyndhurst,
BOROUGH OF NORTH ARLINGTON,
KATHLEEN MOORE, in her capacity
as the Custodian of Records for
the Borough of North Arlington,
BOROUGH OF RUTHERFORD, MARGARET M.
SCANLON, RMC, in her capacity as
the Custodian of Records for the
Borough of Rutherford, BERGEN
COUNTY POLICE DEPARTMENT, CAPTAIN
UWE MALAKAS, in his capacity as
Custodian of Records for the
Bergen County Police Department,
NEW JERSEY STATE POLICE and
SERGEANT HARRY ROCHESKEY, in his
capacity as Custodian of Records
for the New Jersey State Police,

    Defendants-Appellants.

_____

| APPROVED FOR PUBLICATION |
| --- |
| June 11, 2015 |
| APPELLATE DIVISION |

        Argued April 21, 2015 — Decided June 11, 2015

        Before Judges Messano, Ostrer and Sumners.

        On appeal from an interlocutory order of the
        Superior Court of New Jersey, Law Division,
        Bergen County, Docket No. L-19048-14.

Jeffrey S. Jacobson, Director, Division of Law, argued the cause for appellants New Jersey State Police and Sergeant Harry Rocheskey (John J. Hoffman, Acting Attorney General, attorney; Mr. Jacobson and Raymond R. Chance, III, Assistant Attorney General, of counsel; Daniel M. Vannella, Deputy Attorney General, on the briefs).

Richard J. DiLascio, attorney for appellants Township of Lyndhurst and Helen Polito, joins in the brief of appellants New Jersey State Police and Sergeant Harry Rocheskey.

Rubenstein, Meyerson, Fox, Mancinelli, Conte & Bern, P.A., attorneys for appellants Borough of North Arlington and Kathleen Moore, join in the brief of appellants New Jersey State Police and Sergeant Harry Rocheskey.

LaPorta & LaPorta, attorneys for appellants Borough of Rutherford and Margaret M. Scanlon, join in the brief of appellants New Jersey State Police and Sergeant Harry Rocheskey.

Julien X. Neals, Bergen County Counsel, attorney for appellants Bergen County Police Department and Captain Uwe Malakas, joins in the brief of appellants New Jersey State Police and Sergeant Harry Rocheskey.

Samuel J. Samaro argued the cause for respondent North Jersey Media Group Inc. (Pashman Stein and Jennifer A. Borg, attorneys; Mr. Samaro and Ms. Borg, of counsel; Mr. Samaro and CJ Griffin, on the briefs).

American Civil Liberties Union of New Jersey, attorneys for amicus curiae American Civil Liberties Union of New Jersey (Edward Barocas, Jeanne LoCicero and Iris Bromberg, on the brief).

Loccke, Correia & Bukosky, attorneys for amicus curiae State Troopers Fraternal Association and Bergen County Policemen's Benevolent Association Conference (Michael A. Bukosky, on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

This appeal, by leave granted, concerns the public's right to access records pertaining to a criminal investigation under the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13, and the common law right to inspect government records. The Attorney General — on behalf of three municipalities, the Bergen County Police Department, the New Jersey State Police (NJSP), and their records custodians — appeals from the trial court's order compelling disclosure pursuant to both OPRA and the common law. Having reviewed the State's arguments in light of the record and applicable principles of law, we conclude the trial court misinterpreted OPRA's provisions governing criminal investigatory records. The court also erred in declining to consider the State's proposed ex parte showing of why releasing certain requested documents would undermine its investigation and be inimical to the public interest. As a result, we reverse the court's order compelling release of the requested documents, and remand for reconsideration in light of the principles we set forth below.

Plaintiff North Jersey Media Group, Inc. (NJMG) is the owner of numerous print and web-based news organizations, including The Record, a general circulation daily newspaper, and the South Bergenite, a weekly community newspaper. Reporters for these two publications sought various records of local, county, and state law enforcement agencies (LEAs) pertaining to the fatal police shooting of a criminal suspect, Kashad Ashford. The shooting followed a high-speed chase of Ashford and his passenger Jemmaine T. Bynes across multiple municipalities.

The records custodians of the LEAs did not respond consistently. None provided documents before NJMG filed its November 3, 2014, complaint. Thereafter, NJMG received 9-1-1 call recordings, various redacted police documents containing computer aided dispatch (CAD) reports, and a uniform force report (UFR).[1] However, the defendants continue to deny access to many other requested documents, or to even acknowledge they exist.

---

[1] At oral argument, the Director of the Division of Law represented that a further search of the LEAs' files uncovered a UFR, which the State disclosed the preceding week. The State did so pursuant to O'Shea v. Township of West Milford, 410 N.J. Super. 371 (App. Div. 2009). The document is not in the record before us.

The events leading to the fatal shooting are set forth in a September 16, 2014, press release of the Attorney General's Office (OAG); a December 9, 2014, certification of Cortney Lawrence, the NJSP's lead detective in the Attorney General's Shooting Response Team (SRT) investigation; and a December 10, 2014, certification of New Jersey Division of Criminal Justice (DCJ) Lieutenant Robert McGrath, Detective Lawrence's supervisor.[2] A North Arlington resident called 9-1-1 at 2:12 a.m. on September 16 to report an attempted burglary of her vehicle from her driveway. A North Arlington patrol vehicle was dispatched to the scene to interview the resident. Meanwhile, additional officers from the police departments of North Arlington, Lyndhurst, Rutherford, and Bergen County joined the investigation into the attempted burglary.[3] Officers soon spotted an SUV matching the information provided. Police determined the SUV was stolen.

Police attempted to perform a motor vehicle stop, but the driver, later identified as Ashford, refused. Instead, Ashford led officers on a high-speed chase through several

---

[2] Det. Lawrence's statement was based on the detective's "review[] [of] all the evidence and investigative materials in the related file." Lt. McGrath did not specify the basis for his "understanding" of the events leading to the shooting.

[3] Lt. McGrath stated that NJSP officers also were involved in the investigation although he did not specify when that occurred.

municipalities.  At one point, Ashford attempted to ram a police vehicle head-on.  He later crashed into a guardrail on Ridge Road at Route 3 in Lyndhurst.

The press release and the detective's certification present different versions of what happened next.  According to the press release, more than one officer fired upon Ashford after he spun his tires and allegedly backed his SUV at the officers, ramming a police vehicle.[4]  Det. Lawrence's certification issued nearly three months later was less definitive.  The detective stated Ashford and Bynes revved the engine "as if to force their way out"; police had surrounded the vehicle; and ultimately, Ashford was shot and killed.  The detective did not assert Ashford backed up, or rammed a police vehicle, nor did the detective state how many officers shot at Ashford.[5]

---

[4] The press release states:

> Police positioned their vehicles around the SUV in an attempt to apprehend the vehicle's occupants, but the driver put the car in reverse, spinning the tires of the vehicle until the roadway was filled with smoke. The driver allegedly backed the SUV at the officers, ramming a police vehicle. Officers fired upon the driver of the SUV, striking him.

[5] Det. Lawrence certified: "Even after becoming stuck in the wall, the suspects revved their engines at high RPM, as if to force their way out.  Police vehicles and law enforcement
(continued)

A-2523-14T1

Ashford was fatally shot at around 2:27 a.m., and pronounced dead at a nearby hospital at 7:05 a.m. Officers found a .357-caliber Magnum handgun and a facemask in the vehicle. Bynes was arrested at the scene and charged with weapons offenses and receiving stolen property. The SRT immediately assumed control of the investigation. According to released CAD reports, NJSP investigators began interviewing officers that morning.

Following the shooting, <u>The Record</u> reporter Abbott Koloff and <u>South Bergenite</u> reporter Meghan Grant submitted separate requests under OPRA and the common law regarding the incident. On September 16, 2014, Koloff asked Lyndhurst, North Arlington, Rutherford, and the Bergen County Police Department to produce:

> 1. Incident Reports, Operation Reports, Investigation Reports, and/or Offense Reports (including supplemental reports);
>
> 2. Log book notations, daily activity logs, daily bulletins, daily statistical sheets, tally sheets, vehicle logs;
>
> 3. Audio recordings, and if available, written transcripts of such audio recordings of all police and law enforcement dispatches and recorded conversations including all 911 calls;

_____

(continued)
vehicles positioned around the suspects' vehicle. Ultimately, driver Kashad Ashford was fatally wounded by gunshot."

4. Arrest reports for individual(s) in the incidents;

5. All information required to [be] released by law enforcement under Section 3(b) of the New Jersey Open Public Records Act, N.J.S.A. 47:1A-3(b) where (i) an arrest has not yet been made; and (ii) where an arrest has been made;

6. Use of force reports;

7. Audio and Video recordings from the mobile recorders (MVRs) in the vehicles of law enforcement personnel;

8. Motor Vehicle Accident Reports, Crash and Investigation Reports;

9. Computer Aided Dispatch reports;

10. Mobile Data Terminal Printouts (MDTs).

The same day, Koloff requested the following records from the

State Police:

1. use of force report[;] 2. audio recordings of law enforcement dispatches and recorded conversations including 911 calls; 3. audio and video recordings from mobile recorders (MVRs) in vehicles of law enforcement personnel; 4. computer aided dispatch reports[;] 5. arrest reports[;] 6. Motor Vehicle Accident Reports, Crash and Investigation Reports[;] 7. incident reports, operation reports, investigation reports and offense reports (including supplemental reports)[.]

Grant's September 17, 2014, request asked Lyndhurst to

disclose the following documents "as they are created":

8

-All police reports concerning the Sept. 16, 2014 pursuit of suspects later identified as Kashad Ashford and Jemmaine Bynes.

-All use of force reports by Lyndhurst officers concerning the Sept. 16, 2014 shooting.

-Any additional documentation kept by the Lyndhurst Police Department concerning the Sept. 16, 2014 pursuit of suspects later identified as Kashad Ashford and Jemmaine Bynes and shooting.

-Any video tape (or a transcription of the video tape) obtained during the course of the investigation into the Sept. 16 pursuit and shooting.

Although the responses varied, none of the LEAs' records custodians produced responsive documents before NJMG filed its complaint. Lyndhurst's records custodian denied both reporters' requests on September 25, 2014, based on the OAG's ongoing investigation. Before doing that, the custodian had referred the records request to OAG, which referred it back to Lyndhurst. North Arlington's records custodian wrote to Koloff on September 25, 2014, stating that his requests were subject to an "ongoing [OAG] investigation" and the OAG would determine what to release. The Bergen County Police Department's records custodian likewise denied Koloff's request based on the criminal investigatory records exemption.

Rutherford's borough clerk also denied Grant's request in a September 23, 2014, letter, stating it pertained to an

investigation in progress, and release would jeopardize persons' safety, the investigation, or would otherwise be inappropriate. The clerk provided a statement from the Rutherford Police Chief, disclosing that the department generated one CAD entry, two incident reports, a daily activity log, and a copy of radio and telephone transmissions, which were to be turned over to the Attorney General's Office. The police chief stated that all further information requests should be directed to the OAG, at the request of Lt. McGrath, the supervisor.[6]

NJSP postponed its response three times, the last time promising to respond by November 6, 2014. As late as October 23, 2014, the NJSP records custodian wrote that he was "still trying to determine if the investigation into the death of Kashad Ashford was conducted by the NJSP."[7] The records

---

[6] It is unclear from the record whether a similar letter was sent to Koloff.

[7] The records custodian asserted a lack of knowledge, notwithstanding that the State Police's involvement was publicly acknowledged in the OAG's September 16, 2014, press release. Entitled "Attorney General's Shooting Response Team Investigates Fatal Shooting in Rutherford Involving State Police & Local Officers," the release stated:

> Under an Attorney General Directive, the Shooting Response Team, made up of deputy attorneys general, detectives of the Division of Criminal Justice, and detectives of the State Police Major Crime Unit, are dispatched to the scene to handle
>
> (continued)

custodian stated his search was impeded by the lack of a "case number."

NJMG's two-count complaint alleged violations of OPRA and the common law right to know. NJMG sought an order compelling the release, or an in camera review, of documents believed to be exempt; and fees and costs pursuant to N.J.S.A. 47:1A-6. The court entered an Order to Show Cause (OSC) returnable December 12, 2014, which was adjourned to January 9, 2015, at the OAG's request.

After the complaint was filed, Rutherford and the OAG released documents. On December 5, 2014, Rutherford's counsel wrote that he determined disclosure was appropriate under OPRA "despite initially being advised to the contrary by the New Jersey Attorney General's Office." The counsel provided unredacted copies of: a CAD report, a property report, a compact disc (CD) containing the recordings of three phone calls from the public regarding the incident, and a CD containing "Radio Transmissions from Rutherford PD Case # 14-19344, 9-16-14."[8] The

_____

(continued)
  investigations of shootings involving state troopers or officers employed by county prosecutors as detectives/investigators or members of county task forces.

[8] Actual playable copies of the recordings were not included in the record on appeal. Instead, the State simply provided
         (continued)

CAD report listed the names of the officers dispatched, their car numbers, along with their response times, and the name of the dispatcher. It included an entry that all additional information and reports were to be generated by the OAG.

Rutherford's attorney also provided three investigation reports, which were redacted.[9] A <u>Vaughn</u>[10] index was provided, explaining the records were redacted for three reasons: to protect against disclosing personal information that would violate "reasonable privacy interests," pursuant to <u>N.J.S.A.</u> 47:1A-1 and <u>Burnett v. County of Bergen</u>, 198 <u>N.J.</u> 408 (2009); to shield criminal investigatory records, pursuant to <u>N.J.S.A.</u> 47:1A-1.1; and to shield records related to an ongoing investigation, the release of which would be detrimental to the

---

(continued)
photocopies of the CDs. Rutherford's counsel stated they were unredacted.

[9] The reports consisted of: (1) a two-page supplemental investigation report, dated September 16, 2014, by a detective who responded to the scene of "a police involved shooting," and reported taking possession of the handgun found in the suspect's vehicle; (2) a two-page supplemental investigation report, dated September 16, 2014, by a detective-sergeant, who reported that he responded at 3:27 a.m. to the police-involved shooting, conferred with other officers and the police chief, and later made a copy of phone and radio recordings, which were to be turned over to the NJSP; and (3) a November 10, 2014, supplemental investigation report by the detective-sergeant, which was almost completely redacted.

[10] <u>Vaughn v. Rosen</u>, 484 <u>F.</u>2d 820, 826-28 (D.C. Cir. 1973), <u>cert. denied</u>, 415 <u>U.S.</u> 977, 94 <u>S. Ct.</u> 1564, 39 <u>L. Ed.</u> 2d 873 (1974).

public interest, under N.J.S.A. 47:1A-3(a) and (b). Rutherford Police Department telephone and radio recordings were placed on a CD-R, which was turned over to the NJSP.

On December 22, 2014, the OAG released a 9-1-1 call recording, and what its counsel described as "CAD reports" in the possession of the DCJ. The dispatch reports were actually contained within other documents, which were to varying degrees, redacted without explanation. These included: a North Arlington Police Department Investigation Report, which included mostly unredacted incident details, and completely redacted sections entitled "name details" and "narrative details"; a Lyndhurst Police Department Dispatch Log, with the officer name section redacted; a Bergen County Police Department Incident Report Form, which included unredacted information about the incident, but redacted the names of the officers who generated and approved the report, and included a blacked-out half page. The State did not provide a Vaughn index, nor did it expressly confirm whether the remaining requested documents existed.

In its response to the OSC, the State provided certifications from Det. Lawrence and Lt. McGrath. In addition to setting forth details of the events leading to the shooting, Det. Lawrence stated that the SRT assumed control of the investigation "once the shooting took place." The SRT's

investigation of the shooting, as well as its investigation into Bynes's actions, were ongoing at the time of the certification, on December 10, 2014.  However, Bynes, who was released on bail, was fatally shot in Newark in March 2015.[11]  Det. Lawrence asserted that all documents generated after the initial 9-1-1 call were investigatory.

Lt. McGrath generally explained the Attorney General's Directive 2006-5, which established the procedures for investigating fatal police shootings, and the role of the SRT, which operates independently from the ordinary chain of command. Lt. McGrath stated that consistent with the directive, the SRT assumed control of the investigation of the shooting, and the underlying alleged criminal actions of Ashford and Bynes.  Also consistent with the directive, Lt. McGrath expected the matter to be presented to a State Grand Jury after the SRT completed its investigation.  DCJ maintained all evidence and investigative materials.  Lt. McGrath asserted the investigation was ongoing.

With respect to the reporters' document requests, Lt. McGrath conceded the reporters were entitled to the 9-1-1

---

[11] See Dan Ivers, Newark murder victim was second suspect in Lyndhurst fatal police shooting, NJ.com (Mar. 12, 2015, 5:29 PM), http://www.nj.com/essex/index.ssf/2015/03/newark_murder_victim_was_second_suspect_in_lyndhur.html.

recordings and related CAD reports, which the OAG released soon thereafter with redactions in the case of the CAD reports. He explained the initial 9-1-1 recording was not a product of the investigation, although the call prompted it. He did not explain the basis for releasing the CAD reports. Lt. McGrath asserted that releasing "any of the other requested records . . . would irrevocably compromise the ongoing investigation." He contended that release would "corrupt the independent recollections of witnesses," and lead witnesses to alter prior statements, resulting in inconsistent statements that may benefit a defendant. However, Lt. McGrath did not confirm which of the other requested documents were actually withheld, and which simply did not exist.

Lt. McGrath sought the opportunity to present, under seal and ex parte, "case-specific examples of how the threats to the integrity of the ongoing investigation and the negative impact of same on the public interest, would be evident in release of the records being sought for production here." He stated he could not provide a more specific justification without disclosing the information the OAG sought to keep confidential.

On the return date of the OSC, the trial court concluded NJMG was entitled to all the records requested pursuant to both OPRA and the common law, effective upon entry of the court's

order.  The court denied the OAG's motion to review an ex parte certification from Lt. McGrath.

In its decision, the court reviewed the factual history of the case, and the various governmental entities' responses to NJMG's OPRA requests.  The court held that redacting documents was equivalent to the denial of access, citing <u>Newark Morning Ledger Co. v. New Jersey Sports & Exposition Authority</u>, 423 <u>N.J. Super.</u> 140, 148 (App. Div. 2011).

Addressing NJMG's access rights under OPRA, the court concluded that neither the criminal investigatory records exception, <u>N.J.S.A.</u> 47:1A-1.1, nor the ongoing investigation exception, <u>N.J.S.A.</u> 47:1A-3(a), shielded the documents from release.  The former provision excludes "criminal investigatory records" from the definition of government records subject to disclosure under OPRA, unless the records are "required by law to be made, maintained or kept on file."  <u>N.J.S.A.</u> 47:1A-1.1.

The court concluded the governmental entities failed to meet their burden to show the "required by law" exception-to-the-exception did not apply.  The court held that UFRs were required by law to be made, pursuant to Attorney General directives, which have the force of law, citing <u>O'Shea</u>, <u>supra</u>, 410 <u>N.J. Super.</u> at 382.  The court held that 9-1-1 calls, police dispatch records, and CAD entries were also "required by law"

documents, citing Serrano v. South Brunswick Township, 358 N.J. Super. 352, 364 (App. Div. 2003), N.J.S.A. 52:17C-1, and N.J.A.C. 17:24-2.4. Motor vehicle accident reports were not exempt from disclosure because they must be made public pursuant to N.J.S.A. 39:4-131. As for the remaining documents, the court held that local police general orders and policies have the force of law necessary to remove the records from the exemption, citing O'Shea, supra, 410 N.J. Super. at 382-83, and the State failed to demonstrate by competent evidence that those orders or policies did not apply.

The court also rejected the State's reliance on the "ongoing investigation" exception, which applies only if release of documents would be "inimical to the public interest." N.J.S.A. 47:1-3(a). The court was unpersuaded by the State's general argument that release of investigatory materials would taint witnesses' independent recollections. The court declined to consider Lt. McGrath's proposed ex parte submission. The court held that whether to consider documents under seal was a discretionary decision, citing Hammock ex rel. Hammock v. Hoffmann-LaRoche, Inc., 142 N.J. 356, 380 (1995). The judge concluded Lt. McGrath had failed to provide sufficient proof of injury if the proposed second certification were publicly released.

The court likened the State's arguments to the claim that release of investigatory documents would taint potential jurors, which the court stated was rejected in <u>Courier News v. Hunterdon County Prosecutor's Office</u>, 358 <u>N.J. Super.</u> 373 (App. Div. 2003). Additionally, the court discussed the public's substantial interest in police shootings of suspects, particularly given recent incidents in Ferguson, Missouri, and Staten Island, New York. The court noted that significant time had passed since the shooting of Ashford, and witness statements were likely already obtained.

The court also held that the OAG failed to comply with the OPRA provision requiring release of certain information, specified in the law, absent a showing the release would jeopardize persons' safety, an investigation, or was otherwise inappropriate. <u>N.J.S.A.</u> 47:1A-3(b). The court determined the press release was insufficient, and release of underlying documents was required.

The court found the responding entities failed to comply with the timelines mandated by OPRA. Also, the court concluded NJMG was entitled to fees under OPRA and asked the parties to attempt to agree upon a "reasonable quantum of fees." Absent agreement, the court set a schedule for submission of a certification of services, as well as a response.

Finally, the court addressed NJMG's rights under the common law right of public access. Citing Keddie v. Rutgers, 148 N.J. 36 (1997), the court identified the three predicates to the common law right of access. As stated in Keddie, the three predicates are: "(1) the records must be common-law public documents; (2) the person [or entity] seeking access must establish an interest in the subject matter of the material; and (3) the citizen's right to access must be balanced against the State's interest in preventing disclosure." Id. at 50 (internal quotation marks and citations omitted). The trial court noted that no party disputed that the requested documents were common law public records. Moreover, NJMG had standing, given its interest in policing the workings of government. Lastly, balancing the factors set forth in Loigman v. Kimmelman, 102 N.J. 98 (1986), the court found that the public's interest in disclosure outweighed the responding entities' interest in confidentiality.

By order entered January 22, 2015, the court compelled defendants to "locate, identify and produce, without redactions, all responsive records to [NJMG's] OPRA requests and provide such records to [NJMG]" within three days. On January 26, 2015, the court granted a stay until January 30, 2015, but otherwise denied a stay pending appeal. We subsequently granted an

emergent motion for leave to appeal, and stayed the court's order.[12]

## II.

We exercise de novo review of the trial court's decision that OPRA requires disclosure of publicly held records. See, e.g., K.L. v. Evesham Twp. Bd. of Educ., 423 N.J. Super. 337, 349 (App. Div. 2011), certif. denied, 210 N.J. 108 (2012). "We apply the same standard of review to the court's legal conclusions with respect to whether access to public records is appropriate under the common-law right of access." Drinker Biddle & Reath LLP v. N.J. Dep't of Law & Pub. Safety, 421 N.J. Super. 489, 497 (App. Div. 2011). We apply a different and deferential standard of review when a court conducts an in camera review of documents and balances competing interests in disclosure and confidentiality in connection with a common-law-based request to inspect public records. Shuttleworth v. City of Camden, 258 N.J. Super. 573, 588 (App. Div.), certif. denied, 133 N.J. 429 (1992). However, "to the extent [the appellate court] can be said to be reviewing essentially a legal

---

[12] The motion was filed by the Attorney General on behalf of the NJSP and its records custodian. The Bergen County Police Department, Lyndhurst, North Arlington, and Rutherford, as well as their records custodians, joined in the Attorney General's request for emergent relief from the court order. They have joined in the Attorney General's brief on appeal.

determination, [it] can review the documents which the trial judge ordered disclosed . . . ."  Ibid.

In determining whether documents or information related to a criminal investigation must be disclosed under OPRA, a court must engage in a three-stage statutory analysis, which we describe below.  See N.J.S.A. 47:1A-1.1, -3(a), -3(b).  The governmental entity bears the burden to establish a basis for non-disclosure.  N.J.S.A. 47:1A-6.  It is undisputed that but for any exemptions, the requested records qualify as "government record[s]" subject to access under OPRA, because they are documents or recordings made, maintained, or kept on file by public officials.  N.J.S.A. 47:1A-1.1.  The trial court's decision raises interpretational issues as to each stage of the statutory analysis.

First, the court must consider whether the requested document is a "criminal investigatory record[]," which is excluded from the definition of government record generally subject to disclosure under OPRA.  N.J.S.A. 47:1A-1.1.  A "criminal investigatory record" is defined as a document "held by a law enforcement agency which pertains to any criminal investigation or related civil enforcement proceeding[,]" which is "not required by law to be made, maintained or kept on file."  Ibid.  The provision thus raises two issues for analysis: what

"pertains to" an investigation or enforcement proceeding; and what satisfies the "required by law" standard.

Second, even if the document does not qualify as a "criminal investigatory record" — for example, because it is a "required by law" document — the court must consider whether the document may be withheld as a document that "pertain[s] to an investigation in progress by any public agency . . . if the inspection, copying or examination of such record or records shall be inimical to the public interest." N.J.S.A. 47:1A-3(a). This exception, however, does not apply to a record that was "open for public inspection . . . before the investigation commenced." Ibid. We examine the trial court's rejection of the State's claim that release of the documents was "inimical to the public interest."

Regardless of whether a document can be withheld as a "criminal investigatory record" under N.J.S.A. 47:1A-1.1, or as a document pertaining to an ongoing investigation, the release of which would be inimical to the public interest under N.J.S.A. 47:1A-3(a), a public agency must still disclose certain "information" pertaining to a criminal investigation within twenty-four hours of a request or as soon as practicable. N.J.S.A. 47:1A-3(b). This information includes:

> where a crime has been reported but no arrest yet made, information as to the type

of crime, time, location and type of weapon, if any;

if an arrest has been made, information as to the name, address and age of any victims unless there has not been sufficient opportunity for notification of next of kin of any victims of injury and/or death to any such victim or where the release of the names of any victim would be contrary to existing law or court rule. In deciding on the release of information as to the identity of a victim, the safety of the victim and the victim's family, and the integrity of any ongoing investigation, shall be considered;

if an arrest has been made, information as to the defendant's name, age, residence, occupation, marital status and similar background information and, the identity of the complaining party unless the release of such information is contrary to existing law or court rule;

information as to the text of any charges such as the complaint, accusation and indictment unless sealed by the court or unless the release of such information is contrary to existing law or court rule;

information as to the identity of the investigating and arresting personnel and agency and the length of the investigation;

information of the circumstances immediately surrounding the arrest, including but not limited to the time and place of the arrest, resistance, if any, pursuit, possession and nature and use of weapons and ammunition by the suspect and by the police; and

information as to circumstances surrounding bail, whether it was posted and the amount thereof.

          [*Ibid.*]

However, the public agency may withhold such information if release would "jeopardize the safety of any person or jeopardize any investigation in progress or may be otherwise inappropriate to release." *Ibid.* This "exception shall be narrowly construed to prevent disclosure of information that would be harmful to a bona fide law enforcement purpose or the public safety." *Ibid.* When a public agency relies on this exception, it shall issue a brief explanation. *Ibid.*[13]

---

[13] Under appropriate circumstances, a court must also ascertain whether a document pertaining to a criminal investigation is exempt from disclosure pursuant to other "statute; resolution of either or both houses of the Legislature; regulation promulgated under the authority of any statute or Executive Order of the Governor; Executive Order of the Governor; Rules of Court; any federal law, federal regulation, or federal order." *N.J.S.A.* 47:1A-1. Depending on the circumstances, a request for records relating to a criminal investigation may implicate other exemptions. While we do not attempt here to present an exhaustive list, we note the definition of "government record" excludes documents in the following categories that conceivably may be implicated in a criminal investigation: "inter-agency or intra-agency advisory, consultative, or deliberative material"; under specified circumstances, "photographs and videotapes of the body . . . of a deceased person" in connection with autopsies; "security measures and surveillance techniques which, if disclosed, would create a risk to the safety of persons, property, electronic data or software"; and "information which is to be kept confidential pursuant to court order." *N.J.S.A.* 47:1A-1.1. Also, OPRA does not override any grant of confidentiality or privilege previously established or recognized by the Constitution, statute, court rule, or judicial case law, *N.J.S.A.* 47:1A-9(b), which would include, among others, documents covered by the informer's privilege, *N.J.R.E.* 516, and attorney-client privilege, *N.J.R.E.* 504. As defendants
(continued)

We turn first to the court's determination that the State failed to meet its burden to show that the requested documents were criminal investigatory records, that is, records "pertain[ing] to any criminal investigation or related civil enforcement proceeding[,]" and "not required by law to be made, maintained or kept on file." See N.J.S.A. 47:1A-1.1. As explained above, "required by law" documents constitute an exception-to-the-exception of documents pertaining to a criminal investigation or related civil enforcement proceeding. Based on the legislative history, and prior case law, we are persuaded that the court interpreted the "required by law" exception-to-the-exception too broadly. On the other hand, the court's findings with respect to release of 9-1-1 recordings and part of the CAD reports are consistent with principles we shall set forth below regarding what constitutes documents that do or do not "pertain[] to any criminal investigation." See ibid.

A.

We address the "required by law" issue first. We begin by reviewing legislative history, which justifies applying pre-OPRA case law in interpreting this exception-to-the-exception. We

_____

(continued)
do not invoke these exclusions, we do not address their applicability to the case before us.

then review that case law, and apply it to the requests in this case.

OPRA was adopted in 2002 as an amendment to the Right to Know Law (RTKL), which had remained largely intact since its enactment in 1963. L. 1963, c. 73.[14] The RTKL generally created a statutory right of access to government documents "required by law to be made, maintained or kept on file." L. 1963, c. 73, § 1, repealed by L. 2001, c. 404, § 17. The "required by law" precondition was narrowly construed. See, e.g., Keddie, supra, 148 N.J. at 46 ("[T]his Court has consistently held that the Right-to-Know Law's definition of a public record is narrow and is to be strictly construed."). The RTKL also excluded from release documents pertaining to investigations in progress, if release would be inimical to the public interest. L. 1963, c. 73, § 3 (permitting the denial of access to records that "pertain to an investigation in progress . . . [and] inspection, copying or publication of such record or records shall be inimical to the public interest").

The "required by law" standard was recognized as a significant impediment to public access under the law. As noted

_____

[14] Amendments were adopted in 1995 to address issues involving biotechnology trade secrets, see L. 1995, c. 23, and in 1998 to address convicts' access to certain information. L. 1998, c. 17, § 1.

by Senator Robert J. Martin, the principal co-author of the Senate version of the legislation that ultimately was enacted as OPRA:

> We have a Right to Know Act, which dates back to 1963. The problem with that law is that it only requires . . . [access to] documents that are required by law to be made . . . maintained, or kept on file. The statute, in other words, is very narrow in its form. And what has happened is that many records, which the public, I think, would expect to be available to them, are not required by law to be made — to be maintained.
>
> [Public Hearing before Senate Judiciary Comm., Senate Bill Nos. 161, 351, 573, and 866, 209th Legislature (March 9, 2000) (Statement of Sen. Martin) at 1-2.][15]

The legislative response in OPRA required access to "government records" subject to enumerated exceptions, and defined "government records," as those in their various forms, "that ha[ve] been made, maintained or kept on file" without regard to whether the law required them to be made, maintained, or kept on file. This change was embodied in the legislation as introduced, and as finally enacted. Compare Assembly Bill No.

---

[15] Senator Martin and Senator Byron M. Baer were the original sponsors of Senate Bill No. 2003, which was introduced in December 2000. That bill was similar — although not identical — to Assembly Bill No. 1309, originally introduced by Assemblymen George F. Geist and Jack Collins, which as amended was enacted as OPRA. The public hearing pertained to prior versions of reform legislation.

1309, 209th Legislature (Pre-filed for Introduction in the 2000 Session) and Senate Bill No. 2003, 209th Legislature (December 14, 2000), with Assembly Bill No. 1309, 209th Legislature (Fifth Reprint) (January 8, 2002), and L. 2001, c. 404, § 2.

In its initial version, the legislation did not single out criminal investigatory records for special treatment within the definition of "government record." However, a Senate floor amendment offered by Senator Martin to the Assembly-passed version of Assembly Bill No. 1309 changed that. The amendment excluded from the definition of government records, "criminal investigatory records," which it defined as "a record which is not required by law to be made, maintained or kept on file that is held by a law enforcement agency which pertains to any criminal investigation or related civil enforcement proceeding." See Assembly Bill No. 1309 (Fifth Reprint). Such records were "deemed . . . confidential" for the purposes of the statute, as were other documents covered by other exemptions. The purpose was to narrow access to criminal investigatory records. See Statement to Senate Bill No. 2003 with Senate Floor Amendments, 209th Legislature (Proposed by Senator Martin) (Adopted May 3, 2001) ("The amendments exempt criminal investigatory records of a law enforcement agency from the statutory right of access.

However, a common law right of access could be asserted to these and other records not accessible under the statute.").

Also part of the floor amendment was the provision now codified at section 3(b), described above, which requires disclosure of specified information about a criminal investigation, notwithstanding any exemption from disclosure, provided it does not jeopardize persons' safety, the investigation, or is otherwise inappropriate. The provisions of section 3(b) were largely drawn from an executive order of Governor Whitman, see Exec. Order No. 69, ¶ 3 (Whitman) (May 15, 1997), which in turn largely incorporated the terms of an executive order of Governor Kean. See Exec. Order No. 123, ¶ 2 (Kean) (Nov. 12, 1985).

Beginning with an order of Governor Hughes in 1963, "[f]ingerprint cards, plates and photographs and other similar criminal investigation records which are required to be made, maintained or kept by any State or local government agency" were exempt from disclosure under the RTKL. Exec. Order No. 9, ¶ 2(e) (Hughes) (Sept. 30, 1963). Governor Kean continued this exemption, with the proviso that the information, ultimately identified in section 3(b), "shall be made available to the public as soon as practicable unless it shall appear that the release of such information will jeopardize the safety of any

29                                                    A-2523-14T1

person or any investigation in progress or be otherwise inappropriate." Exec. Order No. 123, ¶ 2 (Kean). The order went on to state that "'as soon as practicable' shall generally be understood to mean within 24 hours." Ibid.

Thus, Senator Martin's amendment restored, with respect to criminal investigatory records, the RTKL's "required by law" standard. Criminal investigatory records were exempt from access if they were "not required by law to be made, maintained or kept on file." In other words, the public's right of access to criminal investigatory records reverted to what existed pre-OPRA: access was granted to records "required by law to be made, maintained or kept on file." However, the drafters also codified the mandate to release of identified information, in place since Governor Kean's 1985 order.

In view of this history, it is appropriate to interpret the "criminal investigatory records" exception in OPRA in light of pre-OPRA case law interpreting the RTKL's "required by law" standard in cases involving requests for records pertaining to criminal investigations. According to well-established principles of statutory construction, the Legislature's reinsertion of the RTKL's formulation reflected its approval of prior judicial interpretation, as it applied to criminal investigatory records.

> The construction of a statute by the courts, supported by long acquiescence on the part of the Legislature, or by continued use of the same language or failure to amend the statute, is evidence that such construction is in accordance with the legislative intent. The persuasive effect of such legislative inaction is increased where the statute has been amended after a judicial construction without any change in the language so interpreted.
>
> [Lemke v. Bailey, 41 N.J. 295, 301 (1963) (citations omitted).]

"Moreover, courts will not impute a legislative intention to alter an established judicial interpretation absent a 'clear manifestation' of such intent." Coyle v. Bd. of Chosen Freeholders of Warren Cnty., 170 N.J. 260, 267 (2002) (citation omitted). The case for inferring legislative endorsement of prior judicial interpretation is especially strong in this case, which presents not merely the acquiescence in prior language, or amendment without change of prior language, but the affirmative restoration of prior language after its deletion in earlier versions of the legislation.[16]

We recognize that OPRA generally commands that limitations on access to government documents "shall be construed in favor of the public's right of access." N.J.S.A. 47:1A-1. By

---

[16] We thus part company with the view of the panel in O'Shea, supra, 410 N.J. Super. at 381, that gave little weight to decisions under the RTKL, in interpreting the "criminal investigatory records" exception.

contrast, as noted, the "required by law" standard was narrowly construed, including as applied to records related to criminal investigations. See Shuttleworth, supra, 258 N.J. Super. at 581; Home News Publ'g Co. v. State, 224 N.J. Super. 7, 11 (App. Div. 1988). We do not construe OPRA's general rule of construction as a basis to deviate from the established interpretation of the "required by law" standard, which by amendment was reinserted into OPRA. The OPRA rule of construction guides statutory interpretation where the statute is unclear, or ambiguous. The "required by law" standard was already clearly defined by established case law.

## B.

According to pre-OPRA judicial interpretation, documents are "required by law to be made, maintained or kept on file," if so mandated by a statute, regulation, executive order, or judicial decision. We are not persuaded that a generic record retention policy, or an internal agency directive of a public official would suffice to satisfy the "required by law" standard with respect to criminal investigatory records.

The distinction between documents "required by law," and documents created through the exercise of discretion, was recognized in Irval Realty Inc. v. Board of Public Utility Commissioners, 61 N.J. 366 (1972), which involved civil

investigational records.  Id. at 369-71.  After a gas explosion, the plaintiffs sought reports that a utility prepared and filed with the Board of Public Utility Commissioners (PUC), and an investigative report prepared by the PUC staff.  Id. at 369-70. The utility's report was prepared pursuant to a formally promulgated PUC regulation requiring utilities to report certain accidents.  Id. at 370.  The Court held that the RTKL encompassed the utility's reports because the PUC's regulation had "the force of law and require[d] that such reports be made." Id. at 375.  The Court did not so find as to the PUC staff's reports, stating, "Whether the investigation reports prepared by members of defendant's staff meet this definition is less clear, but need not be decided here since they certainly qualify as public records within the scope of the common law rule."  Ibid.[17] See also Attorney General George F. Kugler, Jr., New Jersey's Right to Know, A Report On Open Government 9 (1974) (stating that the "required by law" precondition "clearly embodies administrative rules and regulations as well as statutes").

In another utility case, the Court held that an order of the Board of Public Utilities (BPU), which directed solid waste

_____

[17] The Court did not address the exemption under section 3 of the RTKL governing release of documents pertaining to ongoing investigations, where release would be inimical to the public interest.  See L. 1963, c. 73, § 3.

utilities to provide the BPU with customer lists, did not satisfy the RTKL's "required by law" standard, meaning the lists were not subject to release under the RTKL. In re Request for Solid Waste Util. Customer Lists, 106 N.J. 508, 525 (1987) ("In re Request"). The Court stated: "The lists are not 'records which are required by law to be made, maintained[,] or kept on file by any board . . . .' [T]he order was merely an administrative directive, and not the equivalent of either a statute or a Board regulation . . . and therefore not subject to disclosure as public records." Ibid. (citation omitted).

In another case, the Court also held that the RTKL did not cover documents pertaining to a background character investigation, performed in response to the Governor's discretionary request. Nero v. Hyland, 76 N.J. 213, 220-21 (1978). The records were not "required by law to be made, maintained or kept on file" because "[n]o statute, regulation, executive order or judicial decision require[d] that the Governor conduct a character investigation . . . ." Ibid. The Court rejected the trial court's "engrafting upon [the RTKL] the definition of a public record contained in the Destruction of Public Records Law [(DPRL)], N.J.S.A. 47:3-16." Id. at 221.

The Court directly addressed a RTKL request for documents pertaining to a criminal investigation in State v. Marshall, 148

N.J. 89, <u>cert. denied</u>, 522 <u>U.S.</u> 850, 118 <u>S. Ct.</u> 140, 139 <u>L. Ed.</u> 2d 88 (1997). In his effort to collaterally challenge his conviction, Marshall sought access to the entire investigative file in his case. <u>Id.</u> at 268.

The Court broadly and unqualifiedly held, "The Right-to-Know Law does not provide defendant with the right to inspect the law-enforcement files sought in this case because no law or regulation requires that such files 'be made, maintained or kept.'" <u>Id.</u> at 272-73 (citation omitted). The court cited with approval <u>River Edge Savings & Loan Association v. Hyland</u>, 165 <u>N.J. Super.</u> 540, 545 (App. Div.), <u>certif. denied</u>, 81 <u>N.J.</u> 58 (1979), for the proposition that "no law required that results of law-enforcement official's investigation into alleged criminal offense be maintained or kept, and thus such results were not subject to Right-to-Know Law." <u>Marshall</u>, <u>supra</u>, 148 <u>N.J.</u> at 273. The court also approvingly cited <u>Asbury Park Press, Inc. v. Borough of Seaside Heights</u>, 246 <u>N.J. Super.</u> 62, 67 (Law Div. 1990), for the principle that "no law required that police reports be maintained or kept and thus reports were not subject to [the] Right-to-Know Law." <u>Marshall</u>, <u>supra</u>, 148 <u>N.J.</u> at 273.

We applied these principles in denying a newspaper's claim under the RTKL to access to a police department's

investigational reports in <u>Daily Journal v. Police Department of Vineland</u>, 351 <u>N.J. Super.</u> 110, 120-21 (App. Div.), <u>certif. denied</u>, 174 <u>N.J.</u> 364 (2002).

> We have found no case holding that criminal investigation reports are public records under the RTKL. Indeed, the courts have held to the contrary, on the basis that no law or regulation requires the making, maintaining or keeping on file the results of a criminal investigation by a law enforcement officer or agency.
>
> [<u>Id.</u> at 120.]

We rejected the contention that the "required by law" standard was satisfied by <u>N.J.S.A.</u> 40:48-6, which we stated "provides how . . . governmental material shall be kept in order to secure the material against fire and ordinary theft," or by <u>N.J.S.A.</u> 40A:14-118, which "provides only for the creation of a police force and for the maintenance, regulation and control thereof." <u>Id.</u> at 121. Thus, the incidental or indirect creation or retention of documents is not enough.

We reached a similar conclusion in <u>Shuttleworth</u>, where, as here, the plaintiff sought records involving a fatal police shooting of a criminal suspect. <u>Shuttleworth</u>, <u>supra</u>, 258 <u>N.J. Super.</u> at 579-81. The shooting victim in that case, named Watson, was already in custody. <u>Id.</u> at 578. Specifically, the plaintiff sought "all reports relating to Watson's arrest and the related firearm discharges[,] . . . tape recordings of the

investigation, the police inventory of Watson's possessions, and copies of any rules or procedures of the Camden Police Department pertaining to firearms in the area of prisoner detentions." Id. at 580. We rejected the plaintiff's argument that N.J.S.A. 40:48-6 or provisions of the municipal code required "that the investigative reports . . . be made, maintained or kept on file." Ibid. We stated, "Rather, they provide how material which is in the possession of the government, whether by virtue of some legal requirement or otherwise, is to be maintained. Thus, they need not be 'maintained' by law within the meaning of the [RTKL]." Ibid.[18]

A broad reading of the "required by law" exception to the "criminal investigatory record" exception, as suggested by NJMG, also conflicts with the Legislature's intent as expressed by the adoption of the provision, previously found in Governor Kean's and Governor Whitman's executive orders, mandating disclosure of specified information about a reported crime. See N.J.S.A. 47:1A-3(b). Were access to investigative records as extensive as NJMG suggests, notwithstanding the "criminal investigatory records" exception, then there would have been little need to

---

[18] Strictly speaking, these observations were dictum, as the court stated it did not need to decide whether the police investigative file was a public record under the RTKL. Id. at 581.

mandate disclosure of information in section 3(b). We are unpersuaded by NJMG's argument that the principal purpose of adding section 3(b) was simply to assure the speedy release of the specified information.

We recognize that the RTKL authority reviewed above does not expressly address whether an internal agency directive satisfies the "required by law" standard. Nor do the cases address the impact of judicial decisions requiring the creation or preservation of investigational materials. However, we are unprepared to endorse including them within the universe of documents "required by law to be made, maintained or kept on file."

First, the Court in Marshall spoke definitively and without reservation that the defendant's law enforcement file did not include "required by law" documents. See Marshall, supra, 148 N.J. at 273. We hesitate to find exceptions to the Court's definitive statement of law. See White v. Twp. of N. Bergen, 77 N.J. 538, 549-50 (1978) (noting that trial and intermediate appellate courts are "bound, under the principle of stare decisis, by formidable precedent"). Moreover, we are unprepared to explore the applicability of any judicial mandates to create or preserve investigatory records, inasmuch as NJMG does not

rely on any such requirement, and the issue has not been briefed by the parties.[19]

Second, administrative directives of the Attorney General, similar to the BPU order in In re Request, are "not the equivalent of either a statute or a . . . regulation." See In re Request, supra, 106 N.J. at 525. Concededly, an administrative directive may be deemed, in one sense, to carry the full force and effect of law within the administrative structure. See O'Shea, supra, 410 N.J. Super. at 382 (stating that Attorney General's "Use of Force Policy" which requires police departments to complete and maintain UFRs "has the force of law for police entities," based on the Attorney General's authority under the Criminal Justice Act of 1970, N.J.S.A.

---

[19] For example, the Court has held that police officers must retain notes of witness interviews, in order to preserve them for post-indictment production under Rule 3:13-3. State v. W.B., 205 N.J. 588, 607-08 (2011) (stating "law enforcement officers may not destroy contemporaneous notes of interviews and observations at the scene of a crime after producing their final reports"). The Court has also mandated the creation and retention of documents pertaining to identifications "as a condition to the admissibility." State v. Delgado, 188 N.J. 48, 63 (2006); see also R. 3:11. There is no indication the Court intended or anticipated that such records would, as a consequence of its mandate, be subject to access under OPRA as government records "required by law to be . . . kept on file," even before a defendant is entitled to their release under court rule. Rather, the failure to maintain these records may result in an adverse inference charge in the case of destroyed notes, W.B., supra, 205 N.J. at 608-09, or the exclusion of an out-of-court identification. Delgado, supra, 188 N.J. at 63-64.

52:17B-97 to -117 to adopt "guidelines, directives and policies that bind local police departments"). On the other hand, the same may be said of the BPU order in In re Request — it had the force of law as it concerned the regulated utilities. In re Request, supra, 106 N.J. at 513.

The issuance of directives, such as the UFR directive, usually lies within the Attorney General's discretion and may be withdrawn or modified at will. They also are internal to the agency and related agencies. Attorney General directives address other aspects of the investigative process. See, e.g., Delgado, supra, 188 N.J. at 61-62 (discussing Attorney General guidelines requiring preservation of materials pertaining to identification procedures). On the other hand, "[a]gencies should act through rulemaking procedures when the action is intended to have a 'widespread, continuing, and prospective effect,' deals with policy issues, materially changes existing laws, or when the action will benefit from rulemaking's flexible fact-finding procedures." In re Provision of Basic Generation Serv. for Period Beginning June 1, 2008, 205 N.J. 339, 349-50 (2011) (quoting Metromedia, Inc. v. Dir., Div. of Taxation, 97 N.J. 313, 329-31 (1984)); see also Woodland Private Study Grp. v. N.J. Dep't of Env't Prot., 109 N.J. 62, 69-76 (1987) (analyzing the difference between internal agency directives,

which may be adopted informally, and directives that affect the general public and must be adopted through formal rule-making); In re Request, supra, 106 N.J. at 518-19 (discussing administrative agency's informal action, as distinct from formal rulemaking or adjudication).

Treating internal agency directives on record creation or retention as "required by law" would also create an anomaly under the law. OPRA retained the provision of the RTKL that authorizes agencies to exempt documents from disclosure by "regulation promulgated under the authority of any statute or Executive Order of the Governor." N.J.S.A. 47:1A-1; see also Irval, supra, 61 N.J. at 374 (stating this exemption power was not intended to be "unlimited" and must "be exercised only when necessary for the protection of the public interest"). Thus, an agency may, through formally promulgated regulations, both require the making of a document, and exempt it from access. By its plain language, the exemption power refers to promulgated regulations, and does not extend to informally adopted agency directives. See N.J.S.A. 47:1A-1. It would, therefore, be anomalous to treat documents required or preserved pursuant to internal directives as documents "required by law," since the

directive's author would lack the accompanying power to control its accessibility, which is otherwise granted under OPRA.[20]

## C.

We interpret next what constitutes a document that "pertains" to a criminal investigation. The issue is relevant both to (1) the interpretation of "criminal investigatory record" in N.J.S.A. 47:1A-1.1 — which is defined as a document that "pertains to any criminal investigation or related civil enforcement proceeding" and is "not required by law to be made, maintained or kept on file"; and (2) the interpretation of the ongoing investigation exception in N.J.S.A. 47:1A-3(a) — which exempts from disclosure records that "pertain to an investigation in progress by any public agency" if release would be "inimical to the public interest" and the record was not already open for public inspection.

The ongoing investigation exception, as noted above, was first established in the RTKL. OPRA added the "exception-to-the-exception" for documents already open to the public. L. 2001, c. 404, § 5. Aside from minor wording changes, the RTKL

---

[20]  To the extent the panel's decision in O'Shea relied upon the opposite view, that is, that the "required by law" standard may be satisfied by "guidelines, directives and policies," O'Shea, supra, 410 N.J. Super. at 383, we respectfully disagree. However, the holding in O'Shea was also based on the fact that the UFRs did not "pertain" to an investigation. Id. at 385-86.

exception remained unchanged in OPRA. However, we have found no pre-OPRA, RTKL case that expressly interprets the phrase "pertain to an investigation."

OPRA cases have established that a document that is created before an investigation starts, and therefore does not "pertain" to an investigation at that point, does not change its character once an investigation begins, even if the document relates to the investigation. For example, a 9-1-1 tape created before an investigation begins does not pertain to an investigation commenced later, even if triggered by the 9-1-1 call. Courier News, supra, 358 N.J. Super. at 376, 380-81. In Serrano, the court addressed the "pertain to an investigation" language used in the ongoing investigation exception. Serrano, supra, 358 N.J. Super. at 366. "The tape that is the subject of this appeal was created hours before the police investigation began. If it was a public record when created, then it would remain accessible to the public under N.J.S.A. 47:1A-3(a) even if its release would be inimical to the public interest." Ibid.; cf. O'Shea, supra, 410 N.J. Super. at 385-86 (rejecting argument that a UFR generically pertains to a criminal investigation, as "it cannot be assumed that a UFR might become part of a criminal investigation"). On the other hand, when an officer turns on a mobile video recorder to document a traffic stop or pursuit of a

suspected criminal violation of law, that recording may pertain to a "criminal investigation," albeit in its earliest stages.[21]

However, there are other documents that police prepare, whether or not an investigation is commenced, which may partly pertain to an investigation that has already commenced. For example, daily activity logs or CAD reports are apparently prepared on a regular basis, regardless of whether an officer is performing a community caretaking function, such as assisting a boy who fell off a bicycle; or investigating a crime, such as interviewing a confidential informant regarding an ongoing investigation into gang activity. An entry about the former activity would not "pertain to an investigation," but the latter would. Similarly, a UFR prepared after a police officer shoots a dangerous dog may not pertain to a criminal investigation. However, a UFR documenting the use of force in the course of arresting a criminal suspect would. We conclude that entries related to criminal investigative activities are properly deemed to "pertain[] to any investigation."

---

[21] We do not address whether a recording initiated to document a suspected non-criminal violation of motor vehicle law or a subsequent stop would properly be deemed to "pertain[] to any criminal investigation." See N.J.S.A. 47:1A-1.1.

Applying these principles, we are persuaded that most of the documents sought by the reporters fall within the criminal investigatory records exception, because they are "not required by law to be made, maintained or kept on file" and they "pertain[] to any criminal investigation." See N.J.S.A. 47:1A-1.1.

The reporters seek documents that report officers' daily activities, including CAD reports detailing information received by or from police dispatchers, log book notations, daily activity logs, daily bulletins, daily statistical sheets, tally sheets, and vehicle logs. The requesters also seek various forms of audio and video recordings (as well as transcriptions), including recordings of the pursuit and shooting; communications among police officers and between police officers and others; and recordings made by mobile video recorders (MVRs). The reporters also requested various reports or officer work product, including UFRs, police reports, incident reports, operation reports, investigation reports, offense reports, and supplemental reports. All of these documents are exempt. No law cited to the court required their creation or retention. They pertain to a criminal investigation, to the extent the entries concern or address an officer's involvement in the

search for the attempted burglary suspect, the pursuit of Ashford and Bynes once they were identified as suspects, the shooting of Ashford and arrest of Bynes, the subsequent investigational activities related to Bynes's arrest, and the SRT investigation of the fatal shooting.

We reject NJMG's argument that these documents are "required by law" because the various LEAs are governed by the DPRL and regulations, which require adoption of record retention schedules. N.J.S.A. 47:3-19, -20. No person may destroy public records under his or her control without obtaining consent under the DPRL or regulations thereunder. N.J.S.A. 47:3-17. These provisions of law have been in place unchanged since 1953. L. 1953, c. 410, §§ 5, 6.

The Court in Nero expressly declined to read the DPRL "in pari materia" with the RTKL. Nero, supra, 76 N.J. at 221. As discussed above, we have also repeatedly held that general, non-specific record preservation statutes or regulations do not satisfy the "required by law" standard under the RTKL. See Daily Journal, supra, 351 N.J. Super. at 120-21 (regarding N.J.S.A. 40:48-6, stating that a statute that "provides how . . . governmental material shall be kept in order to secure the material against fire and ordinary theft" does not satisfy the "required by law" standard); Shuttleworth, supra, 258 N.J.

<u>Super.</u> at 580 (stating that statute or code that merely "provide[s] how material which is in the possession of the government, whether by virtue of some legal requirement or otherwise, is to be maintained" does not satisfy the RTKL).

We reach the same conclusion with respect to general retention schedules adopted pursuant to the DPRL. Were we to reach the opposite conclusion, then the criminal investigatory records exception would have virtually no effect. Particularly in light of the legislative history, and the RTKL case-law shielding criminal investigatory records, we shall not presume that the exception is insignificant surplusage. See <u>In re Civil Commitment of J.M.B.</u>, 197 <u>N.J.</u> 563, 573 ("Interpretations that render the Legislature's words mere surplusage are disfavored."), <u>cert. denied</u>, 558 <u>U.S.</u> 999, 130 <u>S. Ct.</u> 509, 175 <u>L. Ed.</u> 2d 361 (2009).

Requested records that fall outside the criminal investigatory records exception include the recording of the 9-1-1 call, which are "required by law" to be maintained for no less than thirty-one days according to promulgated regulations. <u>N.J.A.C.</u> 17:24-2.4.[22] Also outside the exception are motor

---

[22] We do not address whether a countervailing privacy claim by a 9-1-1 caller may lead to the withholding of a 9-1-1 recording, notwithstanding that it is not exempt from the definition of
(continued)

vehicle accident reports, which are required by law to be made available to the public. N.J.S.A. 39:4-131. In addition, those portions of the CAD records and other logs of police activity, which do not discuss or relate to the criminal investigations, are excepted because they do not "pertain[] to any criminal investigation."

IV.

As discussed above, even if documents are not exempt from OPRA as criminal investigatory records, they may be shielded from public access if they pertain to an investigation in progress and release would be "inimical to the public interest." We have already reviewed the meaning of the "pertain to" language. The related issue presented on appeal is the trial court's rejection of the State's argument that release of the withheld documents would be "inimical to the public interest." Although we conclude that most of the records requested were exempt under the criminal investigatory records exception, for the sake of completeness we address the trial court's consideration of this issue.

A case-by-case analysis is appropriate. Cf. Irval, supra, 61 N.J. at 375-76 (rejecting, under common law analysis, after

_____

(continued)
government record. See Serrano, supra, 358 N.J. Super. at 371-72 (Coburn, J., concurring).

review of disputed documents, defendant's claim that public interest in confidentiality outweighed plaintiff's interest in access in the case presented, but observing "nevertheless the facts of another case may quite possibly call for a different result"). The Irval Court stated that, as a general rule, a trial judge should "call for and examine the report or other record" to determine "[i]f in his sound judgment some part or all of the information therein contained should not be revealed . . . ." Ibid.

In our own decision in Irval, we rejected the general argument that "if inspection [by the public] of utility company accident reports were permitted the reports would be less than candid." Irval Realty, Inc. v. Bd. of Pub. Util. Comm'rs., 115 N.J. Super. 338, 345 (App. Div. 1971), aff'd, 61 N.J. 366 (1972). Moreover, we found no threat to the public interest in permitting review of the Board's own reports, once its investigation was completed. Id. at 345-46.

In Serrano, we were unpersuaded that release of 9-1-1 recordings was "inimical to the public interest" assuming for argument's sake they were deemed to pertain to an ongoing investigation. Serrano, supra, 358 N.J. Super. at 367. In particular, we rejected the argument that release of the 9-1-1 tape to a news organization, and its anticipated widespread

dissemination, would interfere with the selection of a jury. Ibid. We surmised that the 9-1-1 caller had no presumed expectation of privacy; the public's interest in release was substantial; any difficulties in impaneling a jury would be manageable; and we noted the attorney for the defendant agreed that release would not deprive the defendant of a fair trial. Id. at 367-69.

In Courier News, we likewise rejected the argument that release of 9-1-1 recordings was "inimical to the public interest," where the defendant asserted that public dissemination of the recording would risk tainting the jury pool, and anticipated playback at trial of an electronically enhanced version of the recording would cause juror confusion. Courier News, supra, 358 N.J. Super. at 381-83. We found that the first concern did not present an insurmountable barrier to selecting a fair and unbiased jury, and the second concern was purely speculative. Ibid.

On the other hand, our courts have recognized "a real need to deny access where there is an ongoing law enforcement investigation, or where the protection of witness information or a witness's identity is at stake. . . ." Shuttleworth, supra, 258 N.J. Super. at 585 (applying common law balancing). The Court in Marshall recognized the public interest in

confidentiality of ongoing criminal investigations, albeit in the context of applying the common law right to inspect public documents:

> The receipt by appropriate law enforcement officials of information concerning the existence or occurrence of criminal activities is critical to the uncovering and the prosecution of criminal offenses, and is thus crucial to effective law enforcement. In order that the flow of such information be not impeded or cut off, the law has long treated the information as confidential and privileged against disclosure, thereby protecting witness security, the State's relationship with its informants and witnesses, and other confidential relationships, among other things.
>
> [Marshall, supra, 148 N.J. at 273 (quoting River Edge Sav. & Loan Ass'n, supra, 165 N.J. Super. at 543-44).]

See also Loigman, supra, 102 N.J. at 107-08 (discussing "the vital public interest in . . . the success of criminal prosecutions and the protection of potential witnesses and informants").

In reference to criminal investigations, the need for confidentiality generally declines once the investigation is closed; but the need for confidentiality, at least as to some materials — such as those pertaining to confidential informants — may survive. See Keddie, supra, 148 N.J. at 54 (recognizing "the need for confidentiality is greater in pending matters than in closed cases," but stating "[e]ven in closed cases . . .

attorney work-product and documents containing legal strategies may be entitled to protection from disclosure"); River Edge Sav. & Loan Ass'n, supra, 165 N.J. Super. at 545 (noting that "even inactive investigatory files may have to be kept confidential in order to convince citizens that they may safely confide in law enforcement officials") (internal quotation marks and citation omitted); cf. Shuttleworth, supra, 258 N.J. Super. at 585 (stating that the "same values do not survive a balancing after the investigation is closed").

The trial court dismissed as exaggerated the State's fear that premature release of witness statements might taint other witnesses' independent recollections and undermine the integrity of the investigation into the police shooting. However, absent review of Lt. McGrath's proposed ex parte, in camera submission, we cannot be so sure.

First, we are convinced that where an investigation is ongoing, the public reporting of one witness's recollections may risk causing another witness to question his or her own recollections, or intentionally or unintentionally conform them to the reported reality. Assessing the extent of the risk is a fact-sensitive inquiry. Notably, the United States Department of Justice recently documented that phenomenon in its report on the fatal police shooting in Ferguson, Missouri. See Dep't of

Justice Report Regarding the Criminal Investigation into the Shooting Death of Michael Brown by Ferguson, Missouri Police Officer Darren Wilson (March 4, 2015) 46, 58, available at http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/doj_report_on_shooting_of_michael_brown.pdf (discussing witnesses' alteration of statements after watching media reports).  In other contexts, the Court has recognized the fallibility of memory, and its susceptibility to suggestion and error.  State v. Henderson, 208 N.J. 208, 268-71 (2011).  We have also endorsed prophylactic measures to prevent witnesses, who may be in league with each other, from learning what others have said and tailoring their testimony accordingly.  See Morton Bldgs., Inc. v. Rezultz, Inc., 127 N.J. 227, 233 (1992) (addressing a trial court's discretion regarding witness sequestration).

Second, the trial court's rejection of the State's concern was premature, as the court did not review the documents at issue, nor permit the State to explain, ex parte, the reasons why release would compromise its ongoing investigation.  An assessment of the public's interest will often require review of requested documents in camera.  See Loigman, supra, 102 N.J. at 108-09; Keddie, supra, 148 N.J. at 53-54.  In some cases, in camera review of a Vaughn index may be appropriate, because the

A-2523-14T1

release of even a "detailed <u>Vaughn</u> index" to a requesting party "may in some cases enable astute parties to divine with great accuracy the names of confidential informers, sources, and the like . . . ." <u>Loigman</u>, <u>supra</u>, 102 <u>N.J.</u> at 111.

Where appropriate, a court should also allow the governmental entity to submit an ex parte explanation as to why disclosure is inimical to the public interest. "Because of the <u>in camera</u> nature of the review, the custodian, if necessary or appropriate, can explain <u>ex parte</u> the significance of documents and the impact their disclosure might have and the trial judge can state his reasons for non-disclosure." <u>Shuttleworth</u>, <u>supra</u>, 258 <u>N.J. Super.</u> at 589 (applying common law right to inspect).

Applying these principles, we conclude it was error for the court to deny the State's motion to submit the proposed McGrath certification ex parte and in camera. As discussed above, there are few requested records in this case that fall outside the "criminal investigatory record" exception; any that did would still be subject to review under the "ongoing investigation exception." Moreover, the foregoing discussion is relevant to the court's consideration of NJMG's claim of a common law right to inspect the documents, which we discuss below.

V.

With respect to section 3(b), the State contends: (1) NJMG is entitled only to the information delineated in the subsection, and not documents that contain such information; and (2) the State disclosed all the information required. We agree with the State as to the first point, but not as to the second.

Had the Legislature intended section 3(b) to oblige a public agency to release records, as opposed to information, it would have said so. We are guided by the plain language of the statute. In interpreting a statute, "[i]f the plain language is clear, the court's task is complete." In re Kollman, 210 N.J. 557, 568 (2012). We assign to words their generally accepted meaning. In re Petition for Referendum on Trenton Ordinance 09-02, 201 N.J. 349, 358 (2010). We must "read every word in a statute as if it was deliberately chosen and presume that omitted words were excluded purposefully." State v. Scott, 429 N.J. Super. 1, 6-7 (App. Div. 2012) (internal quotation marks and citation omitted), certif. denied, 214 N.J. 117 (2013). In particular, we presume the Legislature acts intentionally when it uses "particular language in one section of the statute but omits it in another section of the same Act." N.J. Dep't of Children & Families v. A.L., 213 N.J. 1, 21 (2013) (internal quotation marks and citation omitted).

We conclude the word "information," as used in the statute, is not synonymous with tangible records, such as written documents, notes, or recordings that contain the specified information. The required "information" may be conveyed in a newly drafted press release. Conceivably, the information could be provided in a public oral announcement.

The principal provision of OPRA generally authorizes access to "government <u>records</u>," <u>N.J.S.A.</u> 47:1A-1 (emphasis added), defined to include, among other things, tangible items such as "any paper, written or printed book, document, drawing, map, plan, photograph, microfilm, data processed or image processed document." <u>N.J.S.A.</u> 47:1A-1.1. The drafters recognized that "information" is not limited to its tangible forms. <u>See</u> <u>N.J.S.A.</u> 47:1A-1.1 (stating that "[g]overnment records" include "<u>information</u> stored or maintained electronically," exempting "information received by" a legislator, "including but not limited to <u>information</u> in written form or contained in any e-mail or computer data base") (emphasis added); <u>N.J.S.A.</u> 47:1A-2.2 (discussing government records containing personal "information"). Section 3(b) refers only to "information" and not specific tangible records.

As discussed above, section 3(b) was drawn from Governor Whitman's executive order. That order expressly authorized

public officials to respond orally to requests for the specified information. "The law enforcement official responding to oral requests should make best efforts to respond orally over the telephone . . . ." Exec. Order No. 69 (Whitman), ¶ 3. Although this provision was not imported into OPRA, we reject NJMG's assertion this non-inclusion imbues "information" with a different meaning. Therefore, we conclude the State was permitted to comply with section 3(b) by providing the "information" in a press release.

However, we agree with NJMG that the State failed to include all the information required by the law. In particular, the State omitted "information as to the identity of the investigating and arresting personnel and agency and the length of the investigation." N.J.S.A. 47:1A-3(b). The press release also did not include information on the "use of weapons and ammunition by . . . the police." Ibid. The OAG did not "issue a brief statement" explaining the omissions. Nor did the State argue that its omissions were warranted because release of the information would "jeopardize the safety of any person or jeopardize any investigation in progress or may be otherwise inappropriate to release." Ibid. The State shall promptly release the omitted information, or, upon remand, make a

sufficient showing under section 3(b) to the trial court why it should be excused from doing so.

## VI.

Lastly, we consider the State's appeal from the trial court's order compelling release of the documents pursuant to the common law right of access. The State concedes the requested records are public records, subject to the common law right to inspect. See Nero, supra, 76 N.J. at 222 (stating "[t]he elements essential to constitute a public record are . . . that it be a written memorial, that it be made by a public officer, and that the officer be authorized by law to make it") (internal quotation marks and citation omitted). The State also concedes that NJMG has the requisite standing to request inspection. See, e.g., S. Jersey Publ'g Co. v. N.J. Expressway Auth., 124 N.J. 478, 487 (1991) ("[A] newspaper's interest in keep[ing] a watchful eye on the workings of public agencies is sufficient to accord standing under the common law.") (internal quotation marks and citation omitted); Irval, supra, 61 N.J. at 372 (stating that some showing of interest is required to enforce the common law right to inspect). The State challenges the court's balancing of NJMG's interest in the documents against the LEAs' interest in confidentiality.

The principles governing the common-law balancing are well-settled. We discussed some of them in our discussion above of the balancing under the "inimical to the public interest" standard under the RTKL and OPRA. The balancing of the competing interests in disclosure and confidentiality often involves an "exquisite weighing process by the trial judge." Loigman, supra, 102 N.J. at 108 (internal quotation marks and citation omitted). The Loigman Court recognized the "vital public interest in . . . the success of criminal prosecutions and the protection of potential witnesses and informants." Id. at 107-08. Toward that end, pursuant to executive order, NJSP investigative files may not be disclosed without court order or executive order. Id. at 107-08 (citing Exec. Order No. 48 (Hughes)).

> Since there is a high degree of need for confidentiality in such materials, more than a showing of good faith and citizen status will be required to overcome the public interest in confidentiality. It does not constitute a clear showing of such public need to say only that there may be something corrupt that should be exposed for the benefit of the public.
>
> [Id. at 108.]

Loigman specifically addressed a request under the common law to inspect documents related to an OAG audit of a prosecutor's office's confidential account. Loigman, supra, 102

<u>N.J.</u> at 101. The Court identified several factors the trial court should consider in balancing the requester's needs against the public agency's interest in confidentiality:

> (1) the extent to which disclosure will impede agency functions by discouraging citizens from providing information to the government; (2) the effect disclosure may have upon persons who have given such information, and whether they did so in reliance that their identities would not be disclosed; (3) the extent to which agency self-evaluation, program improvement, or other decisionmaking will be chilled by disclosure; (4) the degree to which the information sought includes factual data as opposed to evaluative reports of policymakers; (5) whether any findings of public misconduct have been insufficiently corrected by remedial measures instituted by the investigative agency; and (6) whether any agency disciplinary or investigatory proceedings have arisen that may circumscribe the individual's asserted need for the materials. Against these and any other relevant factors should be balanced the importance of the information sought to the plaintiff's vindication of the public interest.
>
> [<u>Id.</u> at 113 (citation omitted).]

The motivation of the requester is a relevant consideration in the balancing process under the common law. "Somewhat different but related considerations arise when the citizen seeks access to information to further a public good" as opposed to a private interest. <u>Loigman</u>, <u>supra</u>, 102 <u>N.J.</u> at 104. In connection with requests for a criminal investigatory file, the

Court held in Marshall that "the common-law right to inspect public documents may not be invoked in a pending criminal case by a defendant seeking discovery rights beyond those granted by Rule 3:13-2 to -4." Marshall, supra, 148 N.J. at 274.

As we noted, the need for confidentiality in investigative materials may wane after the investigation is concluded. With respect to grand jury proceedings, for example, "our case law has with increasing frequency expanded the right of victims and some other persons with particular interest to gain access [to grand jury transcripts] after completion of the criminal case." Shuttleworth, 258 N.J. Super. at 585, n.6; see also State v. Doliner, 96 N.J. 236, 246 (1984) (stating that "a strong showing of a particularized need" must be made to secure access to grand jury materials).

We applied the Loigman principles in Shuttleworth which, as noted above, involved the request for documents pertaining to a Camden Police investigation into the fatal police shooting of a suspect in custody. Shuttleworth, supra, 258 N.J. Super. at 578. The investigation in Shuttleworth was closed, and a determination had already been made not to prosecute the involved officer or officers. Ibid. We affirmed the trial court's release of an autopsy report "precisely because the investigation was closed without the filing of charges."

Shuttleworth, supra, 258 N.J. Super. at 595. On the record presented, we were unable to determine which other documents the trial court actually ordered disclosed pursuant to the common law right to inspect. We remanded for an in camera review of documents listed on a Vaughn index. Id. at 589-91.

By contrast, in Daily Journal, we affirmed the trial court's denial of access to records of a grand jury presentment regarding alleged government corruption. Daily Journal, supra, 351 N.J. Super. at 127-31. Although the investigation was also closed, the trial court found that the interests in confidentiality were warranted, particularly in light of the unique nature of the presentment process. Id. at 128-30. Other circumstances may establish an overriding need for confidentiality, despite the closing of an investigation. See Keddie, supra, 148 N.J. at 54; River Edge Sav. & Loan Ass'n, supra, 165 N.J. Super. at 545.

As a procedural matter, a court must make a threshold determination whether an in camera review of documents is warranted. Loigman, supra, 102 N.J. at 109. The review itself may cause unjustified risks to the public's interest in conducting effective criminal investigations. Ibid. The court may first require the submission of a Vaughn index, to identify the documents at issue, and the asserted rationale for

nondisclosure.  Id. at 109-10.  The court may, if appropriate, require the submission of the index in camera, as well as a further explanation of the reasons for non-disclosure.  Id. at 111-12.

Applying these principles, the trial court's order granting access to the requested materials is flawed because it is based on an incomplete record.  We recognize the intense public interest in a case involving the possible use of excessive force by police. The issue has arisen in cases across the country. The public's need to know is not limited to the public's interest in knowing what happened in a particular case. Information may assist the public in evaluating the adequacy of police procedures in general, and the claim that police force is used disproportionately against members of minority groups. Access to records related to fatal police shootings may also be relevant to public policy debates about proposed reforms.

In this case, the discrepancy between the OAG's press release and the investigating detective's subsequent certification raises obvious questions about what happened immediately prior to the shooting.  As noted, it was asserted in the press release that Ashford rammed a police vehicle before being shot.  The detective's certification stated only that Ashford's engine revved "as if" to force his way out from the

63

spot where the car was lodged against the guardrail. The discrepancy between these two documents also raises questions about the reliability or accuracy of the information upon which the press release was based.

The requesters' and the public's interest in access must be balanced against the substantial interests in conducting a thorough and effective investigation, untainted by premature release of investigative materials. In order to engage in a proper balancing of interests, the trial court should have considered the proposed in camera and ex parte submission by Lt. McGrath. See Shuttleworth, supra, 258 N.J. Super. at 589. If the court were still unpersuaded that non-disclosure was warranted, the court should have ordered the State to prepare a Vaughn index, for submission in camera if appropriate. See Loigman, supra, 102 N.J. at 108-12. The court should have reviewed the documents themselves in camera, applying the Loigman factors, and retaining the ability to release a document in a redacted form.

The government's interest in confidentiality may decline once investigative activity ceases. The investigation was ongoing according to certifications submitted to the trial court in December. Over eight months have elapsed since the SRT began its investigation. It is unclear that the investigation is

still ongoing and, if it is, the nature of those continuing activities. The trial court should ascertain, based upon in camera submissions if appropriate, the current status of the investigation, as part of its balancing of competing interests.

Conceivably, one part of the investigation may be closed, while another part is still active. For example, the gathering of evidence of alleged criminal activity by Ashford and Bynes may have ceased, in view of their deaths. In other respects, records regarding the actions of Ashford and Bynes, and statements of Bynes, may still be relevant to the SRT's work. Such facts may be relevant in justifying the release of some documents, but not others.

## VII.

In sum, we remand to the trial court to reconsider plaintiff's requests in light of the principles set forth in this opinion. We have identified those records that are exempt from OPRA pursuant to the criminal investigatory records exception. N.J.S.A. 47:1A:1.1. With respect to the requests for any records that fall outside that exception, the court shall consider whether their release would be inimical to the public interest under N.J.S.A. 47:1A-3(a). In so doing, the court shall review, in camera, McGrath's proposed ex parte certification. However, the State shall promptly comply with

A-2523-14T1

its disclosure obligation under N.J.S.A. 47:1A-3(b), or make a sufficient showing to the trial court why it should be excused from doing so.

The trial court shall also reconsider its determination that plaintiffs are entitled to access under the common law. In so doing, the court shall consider McGrath's proposed certification. The court shall also determine whether a Vaughn index should be prepared and, if so, whether it should be submitted in camera. In light of those submissions, the court shall determine whether to review the withheld documents in camera, and whether release of the requested records is warranted, in whole or in part, with or without redaction.

Affirmed in part, reversed in part, and remanded for reconsideration. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION